**UNITED STATES of America, Appellee,**

v.

**Raymond Charles CURIALE, Appellant.**

**No. 653, Docket 33422.**

United States Court of Appeals
Second Circuit.

Submitted June 12, 1969.

Decided Aug. 4, 1969.

Vincent T. McCarthy, U. S. Atty., Eastern District of New York, Raymond Bernhard Grunewald, Asst. U. S. Atty., Eastern District of New York, on the brief, for appellee.

Theodore Rosenberg and Richard I. Rosenkranz, Brooklyn, N. Y., on the brief, for appellant.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Raymond Curiale appeals from judgments of conviction on three counts of an indictment, entered on jury verdicts of guilty, on October 25, 1968, for receiving or having in his possession, with intent to convert to his own use and gain, and with knowledge that they were stolen, 3,000,000 United States dimes which were the property of the United States and which had been stolen while moving as and constituting an interstate shipment of freight, in violation of 18 U.S.C. §§ 641, 659, 2315 and 2. The appellant was sentenced to five years imprisonment on each count, the sentences to run concurrently. We affirm.

There was evidence from which the jury could have found the following facts. On May 29, 1968, a tractor-trailer carrying 5,000,000 United States dimes from the United States Silver Depository at West Point, New York to Newark, New Jersey was hijacked at Fort Lee, New Jersey. The driver was forced to drive the truck to Queens County, New York, where he was transferred to a car and returned to New Jersey. The truck was then driven off by the hijackers in an easterly direction toward Long Island and was later found abandoned, its gears burned out, in an empty lot in Blue Point

on Long Island on the morning of May 30, 1968.

On June 6, 1968, pursuing a tip that the stolen dimes were being stored at a factory at 160 West Avenue, Patchogue, New York, which was approximately two miles from where the abandoned truck was discovered, agents of the Federal Bureau of Investigation conducted a vehicular surveillance of Curiale, the owner of the factory. Apparently aware that he was under continuous observation, the appellant, Curiale, approached the agents' car and asked why they were following him. Special Agent Curry replied by asking, "What makes you think so?" Observing the radio transmitter in the agents' car, Curiale turned and left, without any additional comment. Later, Curiale picked up his son and two other boys of the same age and drove to a nearby ball park. After removing baseball equipment from his car, Curiale again approached the agents and asked if he would be allowed to finish the game. Agent Curry answered, "Why not?", and then as the appellant walked away, added "What's the trouble? Do you have something on your mind?"

After completion of the ball game, the appellant returned to his home. Two federal agents followed him into his driveway, where Agent Curry for the first time identified himself. He informed Curiale that a matter was under investigation concerning which appellant was believed to have valuable information, and asked the appellant to accompany him and the other agent to the Fifth Precinct of the Suffolk County Police Department about five miles away to discuss the matter at further length. Curiale offered no objection and entered the agents' automobile. Prior to his arrival at the police station at about 8:15 p. m., he had not been advised of his constitutional rights.

At the precinct house, Special Agent Ahearn gave the appellant a printed form setting forth the *Miranda* warnings. The appellant was asked to read the form carefully and sign it if he understood it. After appellant signed the form, Ahearn reminded him that he was not under arrest and was free to leave. Ahearn then expressed interest in the premises at 160 West Avenue in Patchogue, suggesting that stolen merchandise was stored there. The appellant acknowledged ownership of the premises but denied any knowledge of the stolen goods. He added, however, that only a few days before he had rented a rear room of the building to another individual, but had retained a right of access to the room. Ahearn replied that, based on the information he had, he would like to search the entire premises; to this end, he presented the appellant with a Consent to Search form. Ahearn testified:

> "Mr. Curiale read the form, which I presented to him. After reading it, he looked at me and he made a remark, 'If I don't sign this, you are going to get a search warrant.' At that point, I stopped him and said, 'I don't want you to sign on that basis. If you are going to sign it, do it voluntarily.' He just looked and signed it."

Accompanied by the appellant, the agents proceeded to 160 West Avenue and commenced the search. In the allegedly rented rear room, they found a recently constructed wooden platform which did not produce a hollow sound when tapped. Closer examination revealed over 3,000,-000 of the stolen dimes hidden beneath the platform. Unconvinced by the appellant's attempt to disclaim knowledge of, or any involvement in the concealment of the dimes, Ahearn placed Curiale under arrest, and the trial and conviction from which this appeal is taken followed.

■ Among the several issues raised in this appeal, the principal one is whether the appellant, by signing the Consent to Search form, validly waived the protection of the Fourth Amendment against unreasonable searches and seizures. The resolution of the issue depends on whether his consent was a voluntary, intentional and understood waiver of a known right, or, on the contrary, was the product of deceit, duress and coercion, actual or implicit. United States v. Thompson,

356 F.2d 216, 220 (2 Cir. 1965); United States v. Smith, 308 F.2d 657, 663 (2 Cir. 1962). It is well settled that when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968).

Appellant's argument with respect to the issue of consent is two-pronged. The first part, based on the agents' alleged deceit and on his own alleged misunderstanding, is predicated on the facts (1) that at about 6:45 p. m. on the day of the search, the Chief of the Criminal Division of the United States Attorney's office advised Ahearn that the tip, which the government had received, that the stolen dimes were hidden at 160 West Avenue was not sufficient to justify a search warrant for those premises, and (2) that thereafter Ahearn and his superior decided to interview the appellant at the precinct office in hopes of securing a consent to search. It is urged that, in these circumstances, the agents' failure to inform Curiale that there was not enough information for a search warrant, after the latter had suggested, and allegedly believed, that, "If I don't sign this, you are going to get a search warrant," rendered the "consent" to search involuntary.

■ In support of this position, the appellant relies principally on the recent pronouncement of the Supreme Court in Bumper v. North Carolina, *supra*. In that case the Court held that a search cannot be justified as lawful on the basis of consent when that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant. The Court reasoned:

> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."

*Id.* at 550, 88 S.Ct. at 1792. There was no such coercion here. Curiale's statement concerning the search warrant demonstrated an awareness of his right to resist the agents' search in the absence of a warrant. Although he understood his right, he nevertheless chose to relinquish it. We need not decide whether the voluntariness of that relinquishment would have been compromised by the agents' complete failure to respond to the appellant's statement. Here Ahearn's response was sufficient to put the appellant on notice that his consent should not be conditioned on the availability or unavailability of a warrant. There was no duty to disclose that at that particular moment in a continuing investigation there was insufficient evidence to get a search warrant. In any case, it is clear that Curiale knew what he was doing. Relying upon the fact that the dimes were so well concealed that they would not be found, the appellant hoped to turn suspicion away from himself by appearing to give the authorities innocent and wholehearted cooperation. His lack of success, by itself, does not affect the voluntariness of his assent.

■ The appellant also urges that his permission for the search was coerced by the circumstances of the close surveillance and questioning of him at the precinct office. In support of this position at the before-trial suppression hearing, he introduced a psychiatrist who testified that any person under such circumstances "would be under duress and would be responsive to a feeling of doubt and difficulty and uncertainty as to what was going to happen." Furthermore, on the basis of a twenty minute interview with the appellant, the same psychiatrist suggested, with respect to appellant's claim that at the precinct house his heart was beating very fast, that this "represents a very definite sign of anxiety and severe anxiety, * * * that this patient was under considerable strain and * * * that there would be a doubt in my mind as to whether [the appellant] knew really what he was signing." In spite of this testimony, the lower court made a clear

finding that appellant undertook a voluntary, calculated risk in consenting to the search. We are not persuaded that that finding is clearly erroneous; indeed, it is reasonable and logical in the light of the evidence.

Nor do we feel compelled, by the cases cited in appellant's brief, to rule otherwise. Nothing in Martinez v. United States, 380 U.S. 260, 85 S.Ct. 953, 13 L. Ed.2d 959 (1965), vacating 333 F.2d 405 (9 Cir. 1964) so requires. In that case the Supreme Court, without opinion, remanded to the district court to make findings with respect to the petitioner's consent to search, because it concluded that a more exhaustive factual determination was called for. Catalanotte v. United States, 208 F.2d 264 (6 Cir. 1953), is also distinguishable. There the court found that the defendant's yielding to a request for leave to search with the words, "the house is yours" was involuntary, because any person, "when a group of police officers had barged into his home in the dead of night indicating strongly that he was under investigation for crime, would be frightened into inviting the officers to go ahead and search his premises." *Id.* at 268. There was no such intimidation here. United States v. Alberti, 120 F.Supp. 171 (S.D.N.Y. 1954), is also inapposite. In *Alberti*, the court reasonably concluded that the defendant, who had two children asleep in another bedroom of his apartment, was under arrest by five agents, some of them obviously armed, who had informed him that they intended to search his quarters. Under these circumstances the accused did not act voluntarily, but out of resignation, in advising the agents to "go right ahead" and search. In the present case the appellant was not subjected to any such coercive pressures or with such an ultimatum.

■ Appellant's second argument is that the failure to give the *Miranda* warnings at the time he was taken to the precinct station vitiated the ensuing proceedings which culminated in the consent to search. We cannot agree. Miranda v.

Arizona, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966), requires that certain warnings be given when the person being interrogated is "in custody at the station or otherwise deprived of his freedom of action in any significant way." Here, the facts clearly show that appellant's freedom of movement was not restricted prior to the warnings, and he was so advised. The situation is unlike that in Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), on which the appellant also relies, where it was determined that the interrogated suspect was under arrest and not free to go as soon as he gave his name. Moreover, the appellant's claim lacks merit because no incriminating statements were elicited from him during the period prior to the warnings.

■ Appellant next argues that the record is barren of evidence to justify the trial court's charge on aiding and abetting. There is no basis for this contention, as there was evidence from which the jury could have found that the appellant associated himself with the venture and sought by his action to make it succeed. United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938); Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Indeed, the charge was necessary because the jury could have found that the appellant did not take part in the actual hijacking but only aided in bringing it about or in concealing the stolen coins.

■■ Finally, there is no merit to appellant's challenge to the court's instruction that the accused's knowledge that the goods in question had been stolen, may be inferred from his possession of recently stolen goods. United States v. Hart, 407 F.2d 1087, 1091 (2 Cir. 1969). Nor may the court's charge be construed as a comment on appellant's failure to take the stand, where, as here, any explanation showing his possession to have been lawful could have been made through other evidence.

The judgments of conviction are affirmed.