**UNITED STATES of America,
Appellee,**

v.

**William Michael FARUOLO and Anthony
Bernardez, Appellants.**

**Nos. 1126 and 1227, Dockets 74–1350
and 74–1802.**

United States Court of Appeals,
Second Circuit.

Argued July 17, 1974.

Decided Oct. 29, 1974.

Bruce F. Smith, Asst. U. S. Atty. (David G. Trager, U. S. Atty. for the Eastern District of New York, Paul B. Bergman, Asst. U. S. Atty., of counsel), for appellee.

James E. Eagan, New York City, for appellant Faruolo.

William Epstein, New York City (William J. Gallagher, Legal Aid Society, New York City), for appellant Bernardez.

Before MULLIGAN and WINTER,* Circuit Judges, and NEWMAN,** District Judge.

* Of the United States Court of Appeals, Fourth Circuit, sitting by designation.

** Of the United States District Court, District of Connecticut, sitting by designation.

1. The other defendants were John Pastore, Richard Marco, Jr., Frank Felumero, Vincent DiModica, Lester Sellitti and Joseph Bruns.

2. Following the district court's decision on the motion, counsel for the defendants and the Assistant United States Attorney stipulated that the defendants would plead guilty to the conspiracy count, on condition that the suppression issue be preserved for appeal.

MULLIGAN, Circuit Judge:

These are appeals taken by Anthony Bernardez and William Faruolo from judgments of conviction entered on March 8, 1974 in the United States District Court for the Eastern District of New York, following the acceptance, on November 12, 1973, by District Judge Edward R. Neaher, of their pleas of guilty to the second count of a two-count indictment. Count one charged the appellants and six others [1] with receiving and possessing goods stolen from interstate commerce, 18 U.S.C. §§ 2 & 659, and count two charged the same defendants with conspiracy to receive and possess the same stolen goods, 18 U.S.C. § 371. Bernardez and Faruolo were sentenced to probationary terms of three years and five years respectively, with Bernardez' terms to commence upon his release from state prison.

Appellants' sole contention on these appeals is that the district court erred in denying, after a hearing, their motion to suppress contraband which was seized without a warrant from Faruolo's home.[2] We agree with the district court that Faruolo voluntarily consented to the search and therefore affirm.

I

On August 10, 1972, Special Agent John Egan of the FBI received a report that a truckload of women's dresses and wearing apparel, which was being transported by Interstate Dress Carriers, Inc., had been hijacked earlier in the day. During the subsequent investigation, the truck driver provided a descrip-

The agreement further provided that the defendants could withdraw their guilty pleas should this Court reverse and that the Government would agree to the dismissal of the substantive count if this Court affirmed. Judge Neaher accepted the stipulation. This procedure of pleading guilty while preserving an issue for appeal has previously been approved by this Court. United States v. Rothberg, 480 F.2d 534, cert. denied, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973); United States v. Doyle, 348 F.2d 715 (1965); cf. United States v. Selby, 476 F.2d 965 (1973).

tion of the hijackers, as well as of the cargo, a portion of which had been packed in special hangerpack cartons bearing the printed name "Hangerpack." Information from reliable informants indicated that defendant John Pastore, a known hijacker, was involved in the theft and further led to the surveillance of the Staten Island residence of Richard Marco, Sr.

At approximately 11:13 on the morning of August 14, 1972, Egan observed a U-Haul rental truck pull away from the front of the Marco residence. The truck had a lock on the back and was followed by a green Cadillac with New Jersey license plates. After losing sight of the vehicles for a short time, Egan located them parked in the vicinity of the Staten Island home of appellant William Faruolo, where the truck was being unloaded by Faruolo, his son and several of the other named defendants. Its contents, which included some "Hangerpack" containers, were being carried from the truck into Faruolo's house through a side door.

At about 12:45 p. m., the unloading operation completed, Egan followed three of the defendants to the Country Club Diner on Staten Island where they met with John Pastore. Defendant Richard Marco, Jr. and Pastore left the meeting together and the two were observed to drive to 45 Vera Street, Staten Island. There, Marco picked up a second U-Haul which he drove to Faruolo's home, where it was unloaded by several of the defendants. Special Agent William Edwards, who had joined Egan in the investigation, saw them taking large brown "Hangerpack" cartons, as well as hanging garments in plastic bags, from the truck into the Faruolo house.

At approximately 3:30 or 4:00 p. m., when it appeared that they were finished and that some of the defendants were about to leave, Edwards, accompanied by a number of other agents, moved in to make the arrests. Edwards, with his gun drawn, proceeded to the back yard of the Faruolo home where he found Faruolo standing alone near a blue panel truck. Through the truck window, he could see that it was fully packed with hanging garments and on the ground beside the truck were folded "Hangerpack" cartons. After placing Faruolo under arrest, Edwards advised him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), except that he omitted to advise him that he had the right to have counsel appointed if he could not afford an attorney. Faruolo just placed his head in his hands, evidencing a state of disbelief. Edwards did not search him for weapons or place handcuffs on him at that time but he did keep his gun drawn for several minutes until he thought that the situation was under control. He requested that Faruolo be seated at a picnic table and they waited for other agents. Faruolo made no statements during this time other than giving his name, admitting ownership of the house and identifying his seventeen-year old son, who stepped out into the yard for a brief period. Edwards did not speak to the young man but he did suggest to Faruolo that he should direct him to return to the house, which was occupied by Faruolo's wife, among others.

When Egan and Agent Thomas Armstrong arrived, at most, no more than five minutes after Faruolo's arrest, Edwards holstered his gun and informed Egan that the individual under arrest was Faruolo, that it was his house and that he had been given his Miranda rights. Egan then advised Faruolo that he was an FBI agent investigating a hijacking and asked him for permission to search his house. Faruolo was informed that he did not have to permit the search if he did not want to and that the house would not be searched without his consent. Egan, however, did point out that if Faruolo did not consent, a search warrant would be applied for and further conveyed his belief that one would be issued. He also stated that a warrant, because of the late hour, probably could not be obtained until the following morn-

ing, and that, consequently, the FBI would have to keep his house under surveillance to prevent the removal of its contents. Faruolo then, after quietly thinking a minute or two, signed a consent to search form which Egan had previously read to him and which Faruolo had said he understood.[3]

Faruolo was subsequently left in the custody of Special Agent Charles Steadman, while Egan and Edwards proceeded with the search. Faruolo and Steadman went into the house where Steadman correctly and fully advised Faruolo of his *Miranda* rights. Faruolo consented to an interview, during which he admitted that he knew the merchandise was stolen, but he then indicated that he would like to speak to an attorney before answering any more questions and the interrogation terminated.[4]

## II

■ Appellants'[5] principal argument on appeal is that the facts established at the suppression hearing failed to show by clear and convincing evidence that Faruolo's consent was freely and voluntarily given. Specifically, it is urged that Faruolo reluctantly signed the consent form because he feared that the agents would arrest his seventeen-year old son whom they had observed unloading the contraband and also because of Egan's representation that he could get a search warrant.

■■ We adhere to the view reaffirmed in United States v. Mapp, 476

F.2d 67, 78 (2d Cir. 1973) that we must look to the "totality of the circumstances" in determining whether a consent to a search is voluntary or not. Looking at all the circumstances, we conclude that the Government here satisfied its burden of establishing that Faruolo's consent was freely and voluntarily given. After an evidentiary hearing in which agents Egan, Edwards and Steadman as well as the appellant Faruolo testified, the district court found that:

> Egan did not state that Faruolo's wife or son would be prevented from leaving the house [if a warrant could not be obtained until the following morning]. Nor did he, or any other agent, threaten that either wife or son would or could be arrested.

Record at 376. These findings were consistent with the testimony of the agents and the only evidence to the contrary was Faruolo's testimony which Judge Neaher said he disbelieved. *Id.* The issue was one of credibility which the district court, who saw and heard the witnesses, resolved in favor of the agents. United States v. Fernandez, 456 F.2d 638, 640 (2d Cir. 1972).

■ The argument is reduced therefore to the proposition that Egan's statement that he would apply for a warrant, which conveyed the impression that one would be obtained, constituted a coercive factor negating consent. In comparable cases this and other courts[6]

---

3. The district court found that "after being advised of rights to counsel and of his right to refuse permission for a search, Faruolo made no objection, asked no questions or in any other way indicated lack of understanding of his situation, or opposition to a search." Record at 377.

4. Judge Neaher denied a motion to suppress these admissions in a memorandum opinion filed on November 14, 1973. The court found Faruolo's statements admissible irrespective of the validity of his prior consent to the search.

5. The Government did not challenge Bernardez' standing below on this appeal and, in view of our disposition here and of the fact that Faruolo clearly does have standing

to contest the search, we do not consider the issue. United States v. Cangiano, 491 F.2d 906, 912 (2d Cir. 1974).

6. In United States v. Culp, 472 F.2d 459, 461 n. 1 (8th Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 161, 36 L.Ed.2d 692 (1973), the court pointed out that "[m]any cases imply where law enforcement officers indicate only that they will *attempt to obtain* or *are getting* a warrant that such a statement cannot serve to vitiate an otherwise consensual search." (emphasis in original). For example, in United States v. Savage, 459 F.2d 60, 61 (1972) (*per curiam*), cert. denied, 415 U.S. 949, 94 S.Ct. 1470, 39 L.Ed.2d 564 (1974), the Fifth Circuit held that "[t]he consent was not rendered involuntary by rea-

have held to the contrary. Here the defendant had been given partial *Miranda* warnings, he was told that he did not have to consent to the search (in United States v. Mapp, *supra*, 476 F.2d at 77, we held that failure even to advise the person of the right to withhold consent is not fatal but only one factor to be held in the balance) and he consented after being made aware of the fact that a warrant would be obtained. The district court found that Egan's advice was well grounded. There was no deceit or trickery.[7] The court below found that there was not only a sufficient basis for his communicated belief but that in fact there were grounds for the issuance of a search warrant. This is not at all open to serious question. The house and the defendants had been under surveillance. Faruolo was apprehended practically *in flagrante delicto* in his own back yard unloading the stolen goods [8] which he later admitted, after full *Miranda* warnings, he knew had been stolen.

In United States v. Bracer, 342 F.2d 522 (2d Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965), the defendant was arrested while in possession of drugs but he did not consent to a search of his residence until he was advised that a warrant would be obtain-

ed. Judge Smith's opinion, in which he noted that a finding of voluntariness by a district court should not be lightly overturned by an appellate court, emphasized that "the consent was with knowledge that the agents could and would obtain a warrant." Id. at 525. More recently, this Court affirmed "upon the well considered opinion" of the district court, United States v. Kohn, 495 F.2d 763 (1974) (*per curiam*), the denial of a motion to suppress the fruits of a consent search, 365 F.Supp. 1031 (E.D.N.Y.1973). There, approximately ten minutes after observing the delivery of a suitcase of hashish to the defendant's apartment, agents entered the apartment and placed the defendant under arrest. Upon being asked where the bag was located, the defendant inquired whether the agents had a warrant. They advised that they had a "right" to get one and because of the hour they would "secure" the premises until morning. At that point, the defendant consented to a search of the apartment. Like *Bracer, Kohn* implicitly rejects any suggestion that the agents were employing any impermissibly coercive tactic: "Kohn knew of his right to require a search warrant. He specifically asked whether the agents had a warrant and seemed to fully understand the sub-

son of the fact that before signing the form the defendant asked the police officer if the officer could get a search warrant and the officer replied 'Yes, we probably can.' The officer's statement was in response to defendant's inquiry, and it was not a misrepresentation of the facts."

7. Our opinions in United States v. Jordan, 399 F.2d 610, cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968) and United States v. Curiale, 414 F.2d 744, cert. denied, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed. 2d 424 (1969), upon which appellants rely, do not suggest that the consent given here was involuntary. In *Jordan*, we did not even consider whether a law enforcement officer's statement regarding the availability of a warrant was coercive in nature since it was not made until after the defendant had consented to the search and therefore it could not have influenced his decision. The *Curiale* case involved a consent search where there was no probable cause basis for the issuance of a warrant and the agents were apparently

aware of that fact. Thus, when the defendant remarked, "If I don't sign this, you are going to get a search warrant," an agent responded, "I don't want you to sign it on that basis." Although we expressed some reservation about what the result would have been had the agent allowed the defendant to base his consent upon the *mistaken* belief that a warrant could be obtained, we upheld the consent as voluntary since the defendant was aware of his right to resist and the agent had not misled him.

8. The district court stated that the conclusion that a warrant could be obtained was "based in large part, but not exclusively, on the information supplied by the two informants, the fact that Pastore had been personally arrested by Agent Egan on prior hijacking charges, as well as the amount of corroborative evidence independently obtained in the course of surveillance, and in particular, the eyewitnessing of movements of cartons and presence of garments, at [Faruolo's home]." Record at 385–86.

sequent conversation about the agents getting one." 365 F.Supp. at 1034.

■ In our view, in light of these cases, the well founded advice of a law enforcement agent that, absent a consent to search, a warrrant can be obtained does not constitute coercion. There is an admission by the officer that he has no right to proceed unless the defendant consents. There was in fact, here, a fair and sensible appraisal of the realities facing the defendant Faruolo. No person, even the most innocent, will welcome with glee and enthusiasm the search of his home by law enforcement agents. However, in view of all the circumstances [9] which we have detailed, we are persuaded that after realizing the facts, including that he had the right not to consent, Faruolo decided freely and voluntarily to consent to the search.

■ The argument that *Miranda* warnings are a prerequisite to an effective consent to search is not at all persuasive. The contrary was implicit in United States v. Mapp, *supra*, 476 F.2d at 76–79, where no Miranda warnings were given, and explicit in United States v. Kohn, *supra*, 365 F.Supp. at 1034. There is no possible violation of fifth amendment rights since the consent to search is not "evidence of a testimonial or communicative nature." Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966).

Affirmed.

NEWMAN, District Judge (concurring):

This case involves determination of the voluntariness of consent to a search obtained in response to an agent's statements concerning his procuring of a search warrant. I concur in the Court's opinion affirming the convictions because the decision to affirm is no more than an application of controlling precedents of this Circuit to the issues presented. However, the case is for me a close one, and I think additional words are appropriate to indicate the seriousness of defendant's claim and to suggest that in cases of this sort, the line surrounding permissible governmental statements about search warrants should be drawn not one whit beyond the facts of this case.

It has become a frequent practice for courts to state as a general rule the Government's heavy burden to establish the voluntariness of consent to a search and then to find that burden met. Assessment of the "totality of the circumstances," United States v. Mapp, 476 F.2d 67, 78 (2d Cir. 1973), and a reluctance "lightly" to overturn trial court fact-finding on the issue of consent, United States v. Bracer, 342 F.2d 522, 524 (2d Cir. 1965), have combined to produce a rarely broken line of cases in which findings of consent have been upheld. See, *e. g.*, cases collected in Annot.: Validity of Consent to Search Given by One in Custody of Officers, 9 A.L.R.3d 858 (1966). Neither consideration, however, should insulate cases of this sort from careful scrutiny. The Supreme Court has recognized that despite abundant evidence of willingness to permit a search, consent sufficient to validate a warrantless search is not properly found when obtained in response to certain representations by law enforcement officers on the subject of

9. The district court pointed out that "there is no claim or evidence, that at any time other than the gun incident, that Faruolo was physically coerced, restrained or threatened." Record at 377. With respect to the drawn gun the district court found that it "had no lasting effect." Id. at 387. The court further found that "at no time prior to giving consent to the search, were any statements made by the agents which threatened or could have been viewed as threatening to Faruolo's wife or son," id. at 377, and that he "had no cause to be in apprehension for his own safety or that of his family," id. at 378. Moreover, "[t]he Court [did] not believe that Faruolo was 'scared,' and [found] him to have been no more anxious than any other person placed under arrest while in the act of committing what was charged to be criminal activities." Id. "Faruolo, at the time of his arrest, evidenced a state of mind or [sic] disbelief or shame, rather than fear." Id. at 377.

warrants. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In *Bumper* consent was found wanting because obtained in response to an officer's statement that he had a search warrant—a warrant whose validity the State declined to defend. The effect of the officer's statement was deemed sufficiently coercive to undermine the trial court's finding of consent, a finding based on a totality of circumstances that included virtual eagerness by the householder to permit the search.[1] Moreover, as *Bumper* also indicates, trial court fact-finding concerning the underlying facts does not insulate from review the conclusion as to whether the underlying facts constitute sufficient consent to validate a warrantless search.

In this case, the District Judge made the following finding of fact as to what the agent said to the defendant concerning a search warrant:

> Egan further stated that if Faruolo did not consent to a search, a search warrant would be applied for, and he conveyed to Faruolo the belief that a warrant would be obtained.

The danger inherent in predicating consent upon a defendant's response to such a statement is perhaps more clearly discernible if the facts are transposed to the analogous context of waiver of an indictment. Both the warrant and the indictment procedures are designed to assure that a neutral fact-finder intervenes to determine whether probable cause has been established before a home can be searched or a defendant placed on trial. The requirement of a warrant can be obviated if there is voluntary consent; an information can be filed if the accused waives indictment. Generally, waiver of indictment occurs only after a meticulous inquiry of the defendant by the trial judge, in which the defendant is told (a) what a grand jury is, (b) that he has a right to have

his case considered by a grand jury, (c) that a grand jury may either indict or decline to indict, and (d) the consequences of each alternative action. One may speculate whether an accused would be considered to have validly waived indictment if the waiver proceeding consisted solely of the prosecutor's telling him that if he did not consent to a prosecution by information, an indictment would be applied for and, in the prosecutor's view, an indictment would be obtained.

The analogy is not exact, but it does highlight the dangers involved. Were the slate clean, I would be inclined to reject a finding of voluntariness obtained in response to statements about the obtaining of a warrant that did not in some way affirmatively communicate the discretionary aspect of the warrant-issuing process. If a person is confronted with only the choice of permitting an immediate search without a warrant or waiting the brief interval necessary for a warrant to be obtained, he is misled into believing that the only variable in the choice is time, rather than the far more important variable of whether the warrant will be issued at all. If he consents because he has been led to believe that obtaining a warrant is a virtually automatic formality, then regardless of his apparent willingness to permit the search, he has responded to a situation as "instinct with coercion" as the one in *Bumper*, where the officer gained entry not with the assurance that a warrant could be obtained, but with the statement that he had already obtained one. Bumper v. North Carolina, *supra*, 391 U.S. at 550, 88 S.Ct. 1788. If the waiver on which consent to a search is premised is really to be the "intentional relinquishment . . . of a known right," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), there ought to be some indication that the warrant-issu-

---

1. The householder's testimony included the following: "I had no objection to them making a search of my house. I was willing to let them look in any room or drawer in my house they wanted to . . . I let them search, and it was all my own free will." Bumper v. North Carolina, *supra*, at 547, n. 8, 88 S.Ct. at 1791.

ing process is not automatic and that resort to it affords the householder the protection that a warrant will not issue unless a magistrate has found the existence of probable cause.

On two occasions this Court has left open the significance of an agent's statement concerning the likelihood of obtaining a search warrant. In United States v. Jordan, 399 F.2d 610 (2d Cir. 1968), the defendant heard one agent say to another that a warrant could be obtained in any event. This Court upheld a finding of consent because "[e]ven if this last statement were held to be coercive," it did not vitiate the oral consent that had preceded it. Id. at 614. In United States v. Curiale, 414 F.2d 744 (2d Cir. 1969), the defendant himself said to the agent, "If I don't sign this, you are going to get a search warrant," to which the agent replied, "I don't want you to sign [the consent to search form] on that basis. If you are going to sign it, do it voluntarily." Id. at 746. Perceiving the dangers lurking in such conversations, this Court specifically declined to decide whether the voluntariness of the consent "would have been compromised by the agents' complete failure to respond to the appellant's statement." Id. at 747.

Two other decisions, however, uphold a finding of consent in response to statements no more coercive than what was said here. In United States v. Bracer, 342 F.2d 522 (2d Cir. 1965), consent was found notwithstanding that it was given "with knowledge that the agents could or would obtain a warrant." Id. at 525. In United States v. Kohn, 495 F.2d 763 (2d Cir. 1974), consent was found notwithstanding the agent's statement that they "had the 'right' to get one, and that since it was so late they would have to 'secure' the premises, leave a guard, and return with a warrant in the morning." United States v. Kohn, 365 F.Supp. 1031, 1033 (E.D. N.Y.1973).

I agree with Judge Mulligan that these decisions permit a finding of consent to be made notwithstanding an agent's having expressed his well-founded view that a warrant can be obtained. But two qualifications ought to be emphasized.

First, the agent should be permitted to do no more than give his prediction. Even if he need not explain the discretionary aspect of issuing warrants, he surely should not be permitted to convey the idea that no discretion exists. Any intimation that the warrant will automatically be issued should be considered as coercive as the announcement of an invalid warrant in Bumper. Drawing the line at this point admittedly makes validity of consent turn in some instances on subtle shifts of wording by the agent. But words spoken in the process of obtaining consent to waiver of a constitutional right ought to be chosen with care. The officers are not proceeding in haste to make a split-second decision of their authority to apprehend a fleeing suspect. They face a situation that normally calls for the delay necessary to obtain a search warrant. If they are to forego this requirement, it should not be too much to ask that they take care not to confront the accused with a choice that totally obliterates the important protective function of the warrant-issuing process. The agent can always be on the safe side of the line by plainly indicating that he will apply for a warrant and believes one will be issued, but that the decision whether to issue the warrant rests with the judge or magistrate to whom the agent will apply. Here, according to the District Court's finding, the agent stated he would apply for a warrant and predicted its issuance. Whether the prediction was reasonable should not be determinative. That inquiry focuses on what was in the mind of the agent. But determination of consent must focus on the effect of the agent's words upon the defendant. While the words used here did little to convey the discretion-

**498**

ary aspect of issuing warrants, they at least did not conceal it.

Secondly, trial courts considering the voluntariness of consent obtained in response to statements about procuring warrants need not rush to find consent whenever the agent's verbal formula falls within the ambit of language approved in *Bracer, Kohn,* and this case. If consent is really to be determined upon a totality of the circumstances, then the extent to which an agent minimizes the nature of the choice confronting a householder ought to weigh significantly against a finding of consent. Nearly fifty years ago Judge Learned Hand urged District Judges considering search and seizure questions to "search the testimony in such cases with care, remembering that the protection of defendants must in most cases rest finally with them." Marsh v. United States, 29 F.2d 172, 173 (2d Cir. 1928).