UNITED STATES of America

v.

Maria I. CRUZ, Defendant.

No. 88 Cr. 427 (CSH).

United States District Court,
S.D. New York.

Dec. 19, 1988.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., New York City, for U.S.; Thomas
McC. Souther, of counsel.

The Legal Aid Society, Federal Defender
Services Unit, New York City, for defend-
ant; Jack Lipson, of counsel.

MEMORANDUM OPINION
AND ORDER

HAIGHT, District Judge:

Defendant Maria I. Cruz is charged in a
three-count indictment with conspiring to
violate 18 U.S.C. §§ 1001 and 1546, and
with substantive violations of those sec-
tions. § 1001 prohibits the making of false
statements and writings in any matter
within the jurisdiction of any department or
agency of the United States. § 1546 pro-
hibits the making of false statements in
respect of documents required by the immi-
gration laws. In essence, Cruz and her
unnamed co-conspirators are charged with
operating a scheme whereby false doc-
uments were presented to the United
States Consulate in Santo Domingo, Domin-
ican Republic, in respect of applications for
immigrant visas to this country.

On January 22, 1988, a team of three
special agents of the Immigration and Nat-
uralization Services ("INS"), headed by Jo-
seph Occhipinti, interviewed Cruz at her
residence, 853 Riverside Drive, Apartment
6F, in Manhattan. During that interview
the agents seized documents and recorded
statements made by Cruz. Cruz now
moves in advance of trial to suppress the
documents seized and the statements made.
An evidentiary hearing was held to resolve
the factual disputes which arose from the
parties' affidavits.

BACKGROUND

The witnesses at the hearing were Occhi-
pinti, who was the case agent directing the
relevant investigation; defendant Cruz;
Carmen Ascencio, who shared the apart-
ment with Cruz; and INS special agent
Cristina Bankovic, a member of Occhipin-
ti's team who participated in the events of
January 22.[1]

Agent Occhipinti has been employed by
the INS since 1976. He is currently, and
has been since 1984, a supervisory special

1. In the account which follows, page references  are to the transcript of the evidentiary hearing.

agent in charge of the New York City anti-smuggling unit, the investigative arm of the INS which conducts investigations into alien smuggling activity. Tr. 2–3. Occhipinti described his day-to-day responsibilities:

> Basically I supervise criminal investigations, coordinate interregional investigations, and conduct the appropriate managerial duties required as a supervisor.

Tr. 3.

Toward the end of December 1987 or the beginning of January 1988, Occhipinti's unit initiated an investigation based upon intelligence that Cruz was involved in visa fraud and alien smuggling activity. The record does not reveal the details of the intelligence triggering the investigation of Cruz. One fact, however, is clear: when the INS agents went to Cruz' residence on January 22, 1988, they lacked probable cause to obtain a search warrant. Occhipinti testified that prior to his call at the apartment, he had not discussed with an Assistant United States Attorney "the question of whether there was sufficient probable cause to get such a search warrant." Tr. 44. The reason for that omission, Occhipinti made clear, was his own perception that probable cause did not exist. He gave this testimony:

> Q. So can I assume that you had no way of—other than perhaps your general investigator's experience, you are not a lawyer and you were uncertain whether the information you had would provide a basis for getting a search warrant?
>
> A. It was just an allegation. We receive numerous allegations and there was no probable cause to exist at that point for me to get a search warrant.
>
> Q. So in your opinion there was no probable cause?
>
> A. No, it was just an allegation.

*Ibid.*

The agents arrived at the apartment at about 7:10 A.M. on January 22. Occhipinti knocked on the door. Ms. Ascencio opened it. Occhipinti told Ascencio that he was an INS agent and wished to speak with Maria Cruz. Ascencio told Occhipinti that Cruz lived in the apartment. Occhipinti asked if he and the accompanying agents, Bankovic and John Remsen, could enter the apartment for the purpose of speaking to Cruz. Ascencio granted the agents permission to enter the apartment, and they did so.

▌ The record shows that the apartment was shared by Ascencio, Cruz and their respective children. Cruz suggests in her post-hearing brief that Ascencio either did not permit the agents to enter the apartment, or in the alternative limited her consent to simply crossing the threshold, without penetrating into the interior rooms. But Ascencio's testimony on that point is equivocal; and I find on all the evidence that after Occhipinti identified himself and the other agents to Ascencio, Ascencio permitted the agents to enter into the apartment, including the interior. Given the occupancy of the apartment by Ascencio and her children, she had the authority to grant that permission. Accordingly the agents' presence in the apartment was lawful.

It is common ground that when the agents entered the apartment, Cruz was in one of the bedrooms, clad in a robe. As noted, Occhipinti had expressed a desire to interview Cruz. It is disputed whether Ascencio went into the bedroom and brought Cruz out, as the agents testified; or whether one or more agents went to the bedroom and asked Cruz to come out, as Ascencio and Cruz testified. In the view I take of the case, I need not resolve that dispute. It is common ground that when Cruz emerged from the bedroom, Occhipinti was in a room containing "a makeshift type office setup. There was a desk and papers and various type of papers and files on the desk." Occhipinti, Tr. 6. The three agents were in that room when Cruz entered it. *Ibid.*

Occhipinti testified that when Cruz entered the room, he told her he was a supervisor with INS; he introduced the other two agents to Cruz; and advised Cruz that the agents were there because they had received allegations that she was involved in the sale and preparation of various fraudulent documents. Cruz responded that she was employed by the Department of Motor Vehicles, and did in fact prepare

immigration related forms. However, "she denied any involvement in the sale and preparation of fraudulent documents." Tr. 8. According to Occhipinti's account, he then asked if the agents could check the apartment to make sure that she had no fraudulent documents. Occhipinti testified he explained to Cruz that the agents could not perform a search of the apartment without her first giving written permission, and that he had a form which would convey that authority. Occhipinti testified that he showed her with form, read it to her, and that, without saying anything in response, Cruz signed the consent to search form. GX 1. The form recites consent to the search being given at 7:20 A.M. on January 22. Occhipinti "then began a search of the office area and the apartment." As further developed on cross-examination of Occhipinti, the case for the government is this:

Q. So it is your testimony that after you advised her of who you were and what you were looking for, to wit, fraudulent documents, and asked her if you could search, she said, "Sure, go right ahead, search wherever you want"?

A. Yes, sir.

Tr. 31.

Occhipinti's account of the manner in which he obtained Cruz' consent to a search differs in a significant respect from the account given by Cruz. Testifying in her own behalf at the hearing, Cruz gave this account on direct examination:

Q. Did you then get dressed?

A. I put on a robe.

Q. After that where did you go?

A. To the room where my desk was located.

Q. What happened when you came to that room?

A. He sat at my desk and he started questioning me and started going over the papers, looking at papers. I had a bunch of papers on top of my desk. He opened up draws [sic] and he was searching.

Q. What if anything did you say and do when you observed Agent Occhipinti be-

gin going through the papers and searching the draws of the desk?

A. I asked him if he had a court order to check my house, to check my desk, and he said he could get it in a few minutes because he said someone was doing things, doing wrong things, and he also stated that they had sent for special agents that I had done papers for.

Q. Did he say anything else to you?

A. That if he gets the court order I could be arrested at any time. He didn't want to take me out of there and place me in like—get me out of my neighborhood and be ashamed for my neighbors.

Q. Was there a discussion between you and Agent Occhipinti as to whether you would agree or consent to have him search the desk and other parts of your apartment?

A. When he spoke to me I got afraid.

Q. Did he ask you if you would consent to a search of the apartment?

A. After he searched all my papers what can I say? No? He has already gone to my things.

Q. Did he at some point ask you if you would consent?

A. He did actually at the end.

Q. Did you tell him that you would consent?

A. Yes, because I was afraid of being arrested and taken out in handcuffs.

Q. What was it that led you to believe that you would be arrested and taken out with handcuffs if you didn't consent?

A. The way he talked to me.

Tr. 75–76.

Cruz also testified on direct:

Q. Can you describe for us the circumstances that led to your signing that document?

A. When he finished talking to me and he said he could get the paper from the court to search my house in three minutes if he wanted to and it was better if I consented to do it this way, I would not have to go to trouble, then I signed the paper.

Q. When you signed the paper, what did you believe would occur if you didn't sign the paper?

A. I would be arrested.

Tr. 77–78.

On cross-examination by government counsel, Cruz testified:

Q. After you put on your robe, you and the three agents walked back into the room where the desk was?

A. He said that would be a better place to talk.

Q. When you got back to the room where the desk was, you said that he informed you that they had information that you were involved in some immigration activity?

A. He said in fact that he had someone, that I had done papers for somebody, from the Immigration Department, an agent.

Q. Did he threaten to arrest you?

A. He said at this point he was checking on my things, so I asked him for a court paper or something that would allow him to—

He said he could get it within a few minutes if he wanted to.

Q. Where were you standing or sitting?

A. I was standing next to my desk.

Q. Where was Mr. Occhipinti?

A. Sitting at my desk.

Q. Who else was in the room?

A. The other two agents.

Q. You said Mr. Occhipinti was looking through the papers on your desk?

A. Yes.

Q. Do you recall what he said to you?

A. He asked me about some papers that I had, some petition filled out, the envelopes. And he started asking me what I was doing.

Q. Did he ask you to consent to a search of the apartment?

A. After I asked for the court order, yes. He got loud to me and I got scared.

Q. He started shouting at you?

A. He got loud to say he could get it in 3 minutes. He was not as nice as when he came in.

Q. When he came in, you mean in the bedroom, he was nice?

A. He was very polite.

Q. But in the other room—

A. When I asked him for the court order he got—

Q. To the best of your recollection, do you remember what he said?

A. He said to me that he could get it in 3 minutes if he wanted to, and he didn't want to take me in.

Q. That's your testimony, that he said he would get it and have you arrested if you didn't consent?

A. That's right.

Q. Your testimony is that because of that you decided to consent to the search of the apartment?

A. Right.

Tr. 86–88.

Cruz' testimony, that she inquired about the necessity of a court order or warrant and Occhipinti's reply that he could quickly obtain one if Cruz did not consent to a search, was corroborated by Agent Bankovic. On direct examination by the government, Bankovic gave this account of Occhipinti's conversation with Cruz about a search:

Q. At any time did Mr. Occhipinti request that permission be given to search the apartment?

A. Yes, sir, he did.

Q. Could you describe to me the circumstances of that conversation?

A. Mr. Occhipinti indicated we would like to investigate if the allegations were true or not and if Ms. Cruz would give us permission, voluntary permission, to search the apartment, and she responded in the affirmative.

Q. Did you begin to search the apartment at that time?

A. No. sir. We did not.

Mr. Occhipinti gave Ms. Cruz a voluntary consent of search form and he also described to her that was voluntary. He read her the form. I believe he read her the form. I'm not too sure on that.

But she did read it herself, and she had asked: Don't you need a warrant?

To which he responded: We could get one, if you like, or you could sign the consent to search form, if you like. It depends totally upon you.

So she at that time said: Okay, I'll sign the form.

Q. Prior to her signing the form, had you or any of the other agents conducted a search of the apartment?

A. No, sir.

Tr. 104–105.

On cross-examination by defense counsel, Bankovic testified:

Q. You testified that Ms. Cruz asked Mr. Occhipinti something about a warrant, right?

A. Yes.

Q. Do you remember what she asked?

A. She said: Do you need a search warrant?

And Mr. Occhipinti said: If you would like, I can get one, or you could sign this consent to search form.

And he said: That depends totally on you, whatever you would like to do.

Tr. 114–115.

On this clear preponderance of the evidence I find that, not withstanding Occhipinti's apparent disclaimer, at or about the time the search of Cruz' documents began Cruz specifically inquired as to the necessity of a "warrant" or "court order" to permit the search. To that inquiry, Occhipinti made the response that he could get a court order permitting the search, in a matter of just a few minutes. It was only after Occhipinti made that response that Cruz signed the consent to search form. I also find that, at the time of the agents' entry into the apartment and prior to commencement of the search, they lacked probable cause to obtain a warrant for an involuntary search, and Occhipinti knew they lacked probable cause. I base both those findings on Occhipinti's concession, quoted *supra.* I am mindful that agent Bankovic expressed the view that probable cause to search existed, Tr. 116; but the assessment of Occhipinti, a more experienced supervisory agent, is entitled to controlling weight.

It necessarily follows that Occhipinti's response to Cruz, to the effect that he could readily obtain a search warrant, falsely represented his belief at the time; and I am constrained to infer that Occhipinti made that particular response in bad faith. I do not see what other characterization to place upon profession to Cruz of an ability to obtain a search warrant, which, owing to a lack of probable cause he specifically disclaimed in his testimony.

In these circumstances, Cruz signed the consent to search form. Matters then proceeded apace. The search begin, Occhipinti testified, of the living room area and Cruz' bedroom. Tr. 11–12.[2] Occhipinti described what happened next:

Q. Now, approximately how long did the search take?

A. Approximately 40 minutes.

Q. And what did you do when you completed the search?

A. At the time I explained to Ms. Cruz that the search had uncovered fraudulent documents as well as evidence that she in fact was involved in the sale and preparation of fraudulent documents. At the time I explained to her that it was very, very serious and that she had exposure to criminal prosecution, however, I would appreciate her cooperation, that I was very much interested in finding the source of the documents and any of the co-conspirators that she may have been dealing with.

I explained to her that I would advise the U.S. Attorney of her cooperation, that this was a criminal case and he would be the final individual who would make the determination as to what action would be taken.

Tr. 13.

Occhipinti testified that he then read Cruz her *Miranda* rights, reading from a Spanish-language form, which she endorsed, as did Occhipinti and Bankovic. GX 2. Occhipinti then interviewed Cruz in

---

**2.** The agents say they did not begin to search until Cruz signed the consent form. Cruz says Occhipinti had commenced his search of her desk when she emerged from her bedroom. That version fits logically with Cruz' inquiry, which agent Bankovic remembers: "Don't you need a warrant?" I therefore conclude that the search of the desk had at least begun before the colloquy about the warrant took place.

the kitchen of the apartment, and prepared a written statement of what Cruz said, which Cruz signed after swearing Cruz and reading the statement to her. GX 3.

Cruz testified that she was not advised of her rights until Occhipinti had finished writing up the statement and she had signed it. But Occhipinti and Bankovic have testified to contrary; and I could accept Cruz' version only if I was persuaded that the agents departed entirely from lawful procedure. I am not so persuaded.

Nevertheless, for the reasons which follow I conclude that Cruz' motion to suppress must be granted in its entirety.

## DISCUSSION

I first consider the legality of the search.

The agents had no search warrant. But "a warrantless search is constitutionally permissible if there is consent, ... though the Government must sustain its burden of proving that the consent was obtained freely and voluntarily." *United States v. Miley*, 513 F.2d 1191, 1201 (2d Cir.), *cert. denied sub nom. Varvarigos v. United States*, 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975) (Friendly, J.) (citations omitted); *United States v. Curiale*, 414 F.2d 744 (2d Cir.1969) ("It is well settled that when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given.") (citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). The government's burden is to prove by a preponderance of the evidence that the defendant freely and voluntarily consented to the search; credibility of the witnesses is determined by the trial judge; and the judge must consider "the totality of all the circumstances" in determining whether a consent to a search was in fact "voluntary" or "was the product of duress or coercion, express or implied," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed. 2d 854 (1973); *Miley, supra*, at 1201.

The troublesome aspect of the case at bar is Occhipinti's false representation to Cruz that he could obtain a search warrant in a matter of minutes if she did not consent. On this issue, the government's posthearing brief does not accurately summarize the evidence. The brief contends at 2–3:

> ... defendant here was clearly and expressly advised that she had the right to withhold her consent, in which event the INS agents would be required to obtain a search warrant. Had the agents gone on and advised the defendant that they would obtain a warrant if defendant withheld her consent—there is no evidence that they did—this advice, too, would have been permissible and would not render the consent involuntary.

For these propositions the government cites only *Miley, supra*.

Two observations may be made. First, the agents did not tell Cruz they "would be required to obtain a search warrant" if Cruz withheld consent. Had Occhipinti said no more than that, his response would have been technically accurate, carrying within it the implied possibility that the magistrate might have refused the order. But Occhipinti said more than that. According to agent Bankovic, Occhipinti told Cruz: "We *could* get one, if you like, or you could sign the consent to search form, if you like." Clearly Occhipinti was advising Cruz, not of his need to obtain a warrant, but of his unquestioned ability to do so. Equally clearly, that representation was false.

Secondly, that circumstance distinguishes *Miley*, which Judge Friendly characterized as a "typical case of a knowledgeable suspect extending consent to officers under circumstances where they could readily have obtained a search warrant and then attempting to have the evidence suppressed on the ground that the consent was not voluntary." 513 F.2d at 1202. In *Miley*, a narcotics prosecution, drugs had been dispensed by the defendant-apartment owner to undercover agents in that apartment several days before the agents conducted a warrantless search of the same apartment and discovered the additional drugs which defendant sought to suppress. *See* narrative at 513 F.2d 1198–1200.

The Supreme Court in *Schneckloth, supra,* in its review of pertinent circumstances, said that "if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, *or granted only in submission to a claim of lawful authority*—then we have found the consent invalid and the search unreasonable." 412 U.S. at 233, 93 S.Ct. at 2050 (emphasis added). For that proposition the Court first cites *Bumper v. North Carolina, supra,* where the defendant allowed law enforcement officials to search her home after they asserted they had a warrant to search the house. It is not clear from the court's discussion whether that assertion was true or not; the prosecutor, resisting a motion to suppress a weapon found during the search, relied upon the defendant's consent rather than a warrant, which apparently was not produced at the suppression hearing. 391 U.S. at 546 n. 7, 88 S.Ct. at 1790 n. 7. But what rendered defendant's consent involuntary was the officers' assertion that a warrant existed, combined with the defendant's acceptance of that assertion. "I believed he had a search warrant. I took him at his word." *Id.* at 547, 88 S.Ct. at 1791. These circumstances prompted the Court to say at 550, 88 S.Ct. at 1792:

> "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."

This principle controls the case at bar. Indeed, it does so *a fortiori,* since we know from the record that Occhipinti did not believe he could obtain the warrant which he told Cruz would be forthcoming in a matter of minutes if she withheld consent. The "choice" Occhipinti gave Cruz was as illusory as that given to the defendant in *Bumper.*

Several Second Circuit decisions consider whether an officer's statement of ability or intent to obtain a search warrant renders a subsequent consent involuntary. Those cases uniformly stress the sound factual basis for the officer's assertion. Where, tested objectively, grounds for obtaining a warrant exist, the officer's declaration does not *per se* coerce consent, which in the totality of the circumstances may still be voluntary. *See, e.g., United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied,* 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 and 474 U.S. 859, 106 S.Ct. 170, 88 L.Ed.2d 141 (1985) ("Agent Marano told Martinez–Torres that he could obtain a warrant. This statement, *clearly true in light of the ample evidence of illegal activity,* does not vitiate the consent since advising a person of the fact that a search warrant can be obtained does not constitute coercion.") (emphasis supplied); *United States v. Lace,* 669 F.2d 46, 52 (2d Cir.1982), *cert. denied* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106, *rehearing denied* 459 U.S. 1060, 103 S.Ct. 480, 74 L.Ed. 2d 626 (1982) ("In the absence of any *deception,* coercion, or other overreaching on the part of the police, Lace's belief in the inevitability of a search warrant, a justifiable belief under the circumstances, did not preclude a finding that his consent was voluntary.") (emphasis added); *United States v. Faruolo,* 506 F.2d 490, 494 (2d Cir.1974) ("The district court found that Egan's advice was well grounded. *There was no deceit or trickery.* The court below found that there was not only a sufficient basis for his communicated belief but that in fact there were grounds for the issuance of a search warrant.") (emphasis added).

The Second Circuit's decision in *United States v. Curiale, supra,* furnishes an instructive contrast. That was a prosecution for possession of stolen United States coins. Pursuing a tip that the stolen coins were stored at defendant's factory, agents placed defendant under surveillance. The agents had been advised by an Assistant United States Attorney that the tip was not sufficient to justify a search warrant of defendant's premises. 414 F.2d at 747. But the agents said to defendant Curiale that they would like to search the premises, on the basis of the information they had received. According to an agent's testimony, the following then occurred:

"Mr. Curiale read the form, which I presented to him. After reading it, he looked at me and make a remark: 'If I don't sign this, you are going to get a search warrant.' At that point I stopped him and said, 'I don't want you to sign on that basis. If you are going to sign it, do it voluntarily.' He just looked and signed it."

*Id.* at 746.

Curiale's motion to suppress failed because, in the Second Circuit's view, he understood his right to demand a search warrant, and "nevertheless chose to relinquish it." *Id* at 747. The court of appeals went on to say:

Here Ahearn's response was sufficient to put the appellant on notice that his consent should not be conditioned on the availability or unavailability of a warrant. There was no duty to disclose that at that particular moment in a continuing investigation there was insufficient evidence to get a search warrant. In any case, it is clear that Curiale knew what he was doing.

*Ibid.*

■ The distinction between *Curiale* and the case at bar lies in the *Curiale* agent's scrupulous refraining from asserting to the target what the agent did not believe to be true, namely, that he could obtain a warrant at that stage of the investigation. There is a quantum difference between an agent's failure to correct a target's articulated mistaken impression that the agent could get a warrant, sanctioned by the Second Circuit in *Curiale,* and an agent's false representation to a target asking the question if a warrant could be obtained, when in fact the agent knew it could not.

In *Faruolo, supra,* the Second Circuit said of its prior decision in *Curiale:*

Although we expressed some reservation about what the result would have been had the agent allowed the defendant to base his consent upon the *mistaken* belief that a warrant could be obtained, we upheld the consent as voluntary since the defendant was aware of his right to re-sist *and the agent had not misled him.* 506 F.2d at 494 n. 7 (emphasis added).

The holding of Faruolo is that "the *well-founded* advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion." *Id.* at 495 (emphasis added).

In *United States v. Vasquez,* 638 F.2d 507 (2d Cir.1980), consent to search a home was given after the agents told the occupant that "they were in the process of attempting to obtain a search warrant, that it would take time and that the house would be secured in the meantime." *Id.* at 528. The record did not reflect whether or not, in the view of the agents or a prosecutor they had consulted, the facts were sufficient to procure a warrant. *Ibid.* The Second Circuit vacated the conviction and remanded for a further evidentiary hearing. Judge Kearse's opinion, after reviewing some of the Second Circuit's prior observations, goes on to say:

We view the circumstances reflected in the present record as falling somewhere in the area bounded by *Bumper v. North Carolina, supra,* in which there could be no consent because the agents represented that they had a warrant, *United States v. Faruolo, supra,* in which the officers had a well-founded belief that they would obtain a warrant, and the hypothetical situation in *United States v. Curiale,* in which the defendant held the mistaken belief that a warrant would issue while the agents knew there was not probable cause. The record here is susceptible to various inferences on several material points. Although we do not believe that agents were required to keep the Medinas informed of the practicalities, questions remain as to *whether the Medinas were misinformed, and their consents vitiated. Id.* at 529 (emphasis added).

In the case at bar, it is manifest that Cruz was misinformed. Her consent to the search was clearly obtained by a reasonable reliance on Occhipinti's false representation of his ability quickly to obtain a warrant. In consequence, Cruz' consent to the search was not voluntary.

Public policy favors a prophylactic rule of exclusion where law enforcement officers misstate facts. The Supreme Court wrote in *Schneckloth, supra,* at 412 U.S. 228, 93 S.Ct. at 2048:

> But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

The Court then quoted that "classic admonition" in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886):

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

Accordingly I will suppress the fruits of the search. Further I conclude that the statements, obtained immediately after incriminating documents were found, must be suppressed as well. Having found such documents, Occhipinti told Cruz in no uncertain terms that she had committed a serious crime, was in deep trouble, and should cooperate. Cruz' compliance with the agents' further requests was not surprising in those circumstances; but the incriminating documents gave Occhipinti significant leverage, and the search violated

the Fourth Amendment.[3] Even accepting the agents' testimony as to the chronology, and that *Miranda* rights were read to Cruz, the proceedings had by this time become tainted beyond redemption.

For the foregoing reasons, defendant's motion to suppress is granted in its entirety.

It is SO ORDERED.

whereabouts of the incriminating documents, could it do so.

---

**3.** While the agents' presence on the premises was lawful, the government does not invoke the "plain view" doctrine; nor, given the concealed