UNITED STATES of America, Plaintiff,

v.

Terrance ANDERSON, Defendant.

No. 89–CR–440.

United States District Court,
E.D. New York.

Dec. 11, 1990.

Mark Cohen, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

John Apicella, Brooklyn, N.Y., for defendant.

## CORRECTED MEMORANDUM AND ORDER

KORMAN, District Judge.

The United States Attorney seeks reconsideration of a decision rendered from the bench on November 19, 1990, suppressing post-arrest statements. The facts upon which motion to suppress was granted are set out at pp. 2–5 of the transcript of November 19, 1990. Briefly summarized, the testimony at the suppression hearing established that, on June 15, 1989, Agent Valentine, a supervising special agent of the Drug Enforcement Administration arrested Terrance Anderson shortly after Anderson left the Guy Food Market in Brooklyn. While seated in his vehicle, Valentine advised Anderson and another individual, who was subsequently released, of their constitutional rights and asked them whether they understood each right, with Anderson answering as to each right that he understood.

After giving Anderson the *Miranda* warnings, Special Agent Valentine told him that "[i]t would be in the best interests to talk" to him at that point, that "this was the time to talk to us, because once you tell us you want an attorney, we're not able to talk to you," and as far as he, Valentine,

was concerned, if Anderson asked for an attorney, "we probably would not go to the United States Attorney or anyone else to tell them how much they cooperated with us." Tr. 21–22, November 6, 1989.

Valentine reiterated this point at least three times telling Anderson: "Once he wanted a lawyer, he would not be able to cooperate." Tr. 22. Because of the possibility that this effort to induce Anderson to speak followed an assertion by Anderson of his right not to speak, I asked Valentine why he made these statements to Anderson. Valentine responded that:

"[M]y policy is to be direct with people and up front. It was just after the warnings that I went into that little speech as you will, and I then started questioning."

Tr. 23.

Subsequently, Agent Valentine acknowledged that although Anderson had made some incriminating statements, he generally "danced around everything and would not specifically answer my questions." Valentine then became frustrated and told Anderson: "[L]isten, this is your chance to help yourself, if you want to help yourself do it now[.]" Tr. 26–27. According to Valentine, he then concluded the conversation. *Id.* at 27.

Valentine then took Anderson to the Guy Food Market where other agents had by then arrested Anderson's co-conspirators. Anderson and the other persons arrested were thereafter transported to 26 Federal Plaza. While DEA Agent J. Michael Smith was searching Anderson, he asked Anderson if he wanted to cooperate or make any statements. Anderson again allegedly stated that he wanted to do so and Smith called Agent Moorin into the room.

Agent Moorin in words or substance told Anderson that it was in his best interest to speak and that he could only help himself by cooperating. Immediately thereafter, Agent Smith read the waiver of rights form to Anderson who told Smith he understood. After reading it to himself, Anderson signed the waiver of rights form. Anderson then made a statement which was written down by Smith and witnessed by DEA Agent Kerrigan and in which

Anderson identified the members of the Jonas crack organization and described himself as an enforcer for that organization.

In response to a question whether Agent Moorin really believed that it would be in Anderson's best interest to cooperate without an attorney being present to make some arrangements that would get him concrete benefits in return for his cooperation or statements that he made, Agent Moorin replied:

"Well, your Honor, what I was trying to get from Anderson really wasn't a statement. What I was trying to get at this particular time, is there ten [kilograms] in the house or is there some stash place, and if that was happening. If he told me that, then I would immediately call the U.S. Attorney and say, listen, this is what he gave us. What do you want to do[?] Do you want to do it[?]"

Tr. 58–59, October 25, 1989.

## DISCUSSION

■ In granting the motion to suppress Anderson's post-arrest statements, I concluded that the statements made by Agents Valentine and Moorin so undermined the effect of the *Miranda* warnings that it could not be said that they were sufficient to overcome the presumption of coercion that the Supreme Court found was present in custodial interrogation. While the Supreme Court held that the presumption of coercion could be overcome by ensuring that "adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings," *Miranda v. Arizona*, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1966), advising the defendant that it was in his best interest to cooperate and that he would forfeit opportunity to reap the benefits of such cooperation if he asked for an attorney—a statement that was repeated to him three times by Agent Valentine—simply undermined the effect of the warnings and rendered them inadequate. Specifically, I observed:

With respect to the statements made by Agent Valentine that it was in the defendant's best interest to speak, a

statement which he apparently makes as a matter of policy, and his statements, which he said that he reiterated on three occasions that "Once Anderson wanted a lawyer, he would not be able to cooperate," were not only erroneous as a matter of fact and as a matter of law, but they obviously were intended and had the effect of undermining the Miranda warnings and of placing additional compulsions on the defendant to speak.

It, of course, is not true that a defendant represented by a lawyer is not able to cooperate. We all know that it happens all the time. And it is not necessarily true that cooperation at that particular point was in the defendant's best interest.

Similarly, rather than curing the defect that occurred in the initial encounter that the defendant Anderson had with Agent Valentine, the subsequent interrogation in which Agent Moorin participated only compounded the problem.

Like Agent Valentine, Agent Moorin told Anderson that it was in his best interest to speak, that he would only help himself by cooperating.

Again, it is questionable whether it was in his best interest to speak and whether he could only help himself by speaking with the agents.

These statements by Moorin and Valentine so undermine the effect of the Miranda warnings that were given that I find that the presumption of coercion inherent in custodial interrogation, that the Supreme Court found to be present whenever an individual is subjected to incommunicado interrogation, was not overcome in this particular case.

Tr. 6–8.

Just as the Supreme Court suggested in Miranda that "we might not find the defendants statements to have been involuntary in traditional terms," *Miranda v. Arizona*, 384 U.S. at 457, 86 S.Ct. at 1618, I did not find that the post-arrest statements here were in fact involuntary. It sufficed for present purposes to say that the conduct of the D.E.A. Agents here, particularly Agent Valentine, made a mockery of the safe-

guards provided by *Miranda* and that the *presumption* of coercion had not been overcome. *See* W. White, *Police Trickery in Inducing Confessions*, 127 U.Pa.L.Rev. 581, 609 (1979) ("Direct distortion of this magnitude obviously vitiates the effect of the *Miranda* warnings, thus resulting in a violation of the principle that requires that the warnings remain in effect (or at least not be negated by police conduct) throughout the interrogation [footnote omitted].").

Indeed, in terms of the admissibility of the second confession, the case is worse than if Agent Valentine had questioned the defendant without any warnings and the accompanying "distortion". In those circumstances, the second confession made to Agent Moorin would not have been tainted by any affirmative coercive action attached to the taking of the first statement. *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985) ("[A]bsent deliberatively coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" sufficient to warrant the suppression of a second confession obtained after "[a] subsequent administration of *Miranda* warnings."). Because Anderson was initially told that he would forfeit the benefits to be derived from cooperating if he asserted his right to counsel something more than the *Miranda* warnings was required prior to the second interrogation to dispel the effect of the "improper tactics" employed by Agent Valentine. Instead, Agent Moorin compounded the problem when he again stressed the benefits to be derived by cooperating, and when he told Anderson that "he could only help himself by cooperating." Tr. 56, October 25, 1989. Indeed, it was immediately after Agent Moorin made this misleading, if not false, statement that Anderson signed the waiver of rights form. *Id.*

While I chose to view the case here as one in which the *Miranda* warnings had been rendered fatally defective, the confessions must be suppressed for yet another reason. In *Miranda*, the Supreme Court held that if, after the warnings are administered, "the interrogation continues with-

out the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination *and* his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628 (emphasis supplied). Moreover, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege" not to speak. *Id.* at 478, 86 S.Ct. at 1630.

■ Particularly apposite here are the cases in which a consent to search is obtained after the consenting party is advised that a warrant to search will be sought or obtained if consent is not forthcoming. Where the statement of ability or intent to obtain a warrant is well-founded, it will not undermine the voluntariness of the consent. *See United States v. Cruz*, 701 F.Supp. 440, 447 (S.D.N.Y.1988) and cases cited. On the other hand, where a law enforcement officer represents that he will apply for, or obtain, a warrant under circumstances in which it could not be obtained, the consent to search is involuntary. Id. at 447–448. Stated simply, a waiver of a constitutional right cannot be deemed voluntary if it is obtained by false or misleading statements regarding the legal consequences that will follow if a waiver is not forthcoming.[1] Because the statements made to Anderson by Agents Valentine and Moorin were false and misleading and were intended to trick and cajole him into speaking without a lawyer, it is impossible to conclude that the government met its "heavy burden" with respect to the defendant's waiver of his right to the counsel or his right to remain silent.

The United States Attorney argues, however, that "[g]iven the number of arrests to which Anderson was subject in his past, there can be no doubt that he knew full well that he had every right not to cooperate and to assert his right to an attorney", Norling letter, dated November 9, 1989. This argument misses the point. Even if Anderson knew that he could assert the right to an attorney, telling him that he would forfeit the benefits of cooperating if he asked for an attorney and that he could only help himself by cooperating could reasonably be presumed to have the effect of inducing him improperly to waive his rights. Indeed, although Anderson did not testify at the suppression hearing, it is not unreasonable to infer that Agent Valentine *repeatedly* advised him of the risk he took if he asserted his right to counsel precisely because Anderson was aware of his rights and was attempting to exercise them.

*United States v. Bye*, 919 F.2d 6 (2d Cir.1990), which the United States Attorney relies upon in his motion to reargue, stands for the unremarkable proposition that "the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation" does not "convert[ ] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience." The present case involves more than a "mere mention of the possible sentence facing a defendant" and more than a mere mention of the benefits that could be derived from cooperating. 919 F.2d 9.

Accordingly, for the foregoing reasons, the motion for reargument is granted. On reargument, the motion to suppress the defendant's post-arrest statements is granted. The trial is stayed pending ap-

---

1. This case is distinguishable from cases in which misrepresentations relating to the evidence against the defendant are made *after* the defendant has been fully and fairly apprised of his rights. While it may be unwise for the defendant to speak, his decision to speak has been made with full knowledge of the consequences. Unlike such deception, misrepresentations of the kind at issue here undermine the validity of the waiver itself. The case law reflects this distinction:

   [L]ower courts have held confessions admissible when they were prompted by such misrepresentations as that the murder victim was still alive, that nonexistent witnesses have been found, that the murder weapon had been uncovered, that defendant's prints were found at the crime scene, and that an accomplice had confessed and implicated the defendant.... Courts are much less likely to tolerate misrepresentations of law.

   1 LaFave and Israel, *Criminal Procedure* § 6.2(c), at 447 (1984) (footnotes omitted).

peal on the condition that the United States Attorney file a notice of appeal and an application to have the appeal heard on an accelerated basis.

SO ORDERED.