**UNITED STATES of America**

**v.**

**Francis Abdul MOMODU.**

**No. 1:95–CR–294–RCF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 13, 1995.

Kent B. Alexander U.S. Attorney by David C. McClernan, Asst. U.S. Attorney, Atlanta, GA, for U.S.

Natasha Perdew, Federal Public Defender, Atlanta, GA, for defendant.

## ORDER

RICHARD C. FREEMAN, Senior District Judge.

This action is before the court on the Report and Recommendation [R & R] [# 18–1] of Magistrate Judge Richard H. Deane, recommending that defendant's motion to suppress [# 12–1] be denied and that the parties' joint motion for additional time to file briefs [# 16–1] be granted in part and denied in part. Defendant has filed objections to the R & R. For the reasons explained below, the court respectfully declines to adopt the R & R insofar as it relates to the motion to suppress. The court approves and adopts the portion of the R & R dealing with the motion for additional time.

*Background*

At the beginning of the midnight patrol shift on June 15, 1995, Officer Charles Wood of the Cobb County, Georgia, Police Department was briefed along with other officers about a domestic dispute that had been reported at a local apartment complex. As a result of the dispute, the complex was to receive "zone patrolling," a practice wherein officers pay particular attention to a location which has been the situs of a reported problem.

During some "slack time" in his shift, Officer Wood parked in the parking lot of the

complex and began doing paper work. At approximately 4:30 a.m., Officer Wood observed defendant Francis Abdul Momodu drive into the parking lot at "a pretty rapid speed." Transcript of Suppression Hearing [Transcript], at 6. Defendant exited his car carrying something, possibly a bag, and rapidly entered the apartment building. Approximately a minute to two minutes later, Officer Wood observed defendant exit the building still carrying the same item. Defendant returned quickly to his car and drove out of the parking lot "at a rapid pace." *Id.*

As a result of his observations, Officer Wood decided to stop defendant and investigate the circumstances surrounding his presence at the complex. That investigation and a subsequent consent search of a bag in defendant's car revealed that defendant was in possession of a number of pieces of mail addressed to individuals at other apartment complexes in the vicinity. The majority of the mail appeared to be "credit card applications" or "credit card related." *Id.* at 9. The investigation also revealed that defendant was headed to an apartment in an adjacent complex to visit Michelle Davis. Officer Wood arrested defendant for credit card theft.

Subsequently, Wood and other officers went on three occasions to the apartment of Michelle Davis. There, they learned that defendant shared the apartment with Davis. Davis initially declined to give consent to search the apartment, but ultimately permitted the officers to search the apartment twice. Those searches produced additional evidence of defendant's involvement in criminal activity.

Defendant challenges the legality of the initial stop and the subsequent searches conducted that morning. Further, he seeks to suppress the evidence seized as a result of the stop and searches.

*Discussion*

**A. The Initial Stop**

■ Fourth Amendment protections apply to brief investigatory stops such as the one at issue in this case. *United States v.*

*Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). Investigatory stops must be supported by specific, articulable facts sufficient to create a reasonable suspicion of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Smith,* 799 F.2d 704 (11th Cir.1986). The investigating officer must be able to point to "some objective manifestation that the person stopped is or is about to be engaged in criminal activity." *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694. The Supreme Court has noted that the verbal formulations of the standard used to evaluate investigative stops, such as "reasonable suspicion," are not self-defining and cannot provide clear answers to all factual circumstances that may arise. *Id.* Thus, a fact specific, case by case analysis is required.

■ Officer Wood testified at the suppression hearing about the factors which led him to suspect that defendant was involved in criminal activity. He stated:

I saw a Suzuki Side–Kick, dark green, drive into the complex at a pretty rapid speed. The vehicle stopped in front of one of the buildings that was right there close to where I was watching and an individual that was driving, all I could see was one person in the vehicle. He jumped out of the vehicle and rapidly moved into the entrance where the building—looked like he was carrying a bag of some sort, some kind of light-colored, possibly a paper bag, plastic bag, something along that line. Went into the entrance way, was in there for a minute or two and then exited again, kind of in a rapid pace, jumped in a vehicle and left at a rapid pace.

Transcript, at 6. Wood also testified that, in addition to a domestic dispute that had been reported earlier from the apartment complex, the area had "had numerous stolen cars ... prowlers, peeping toms, domestic situations, thefts."[1] *Id.* at 5.

On cross examination, Wood conceded that defendant did not come close to matching the description of the man involved in the earlier domestic violence call, that defendant's

---

1. The court notes that Officer Wood did not testify to a history of drug related crimes in the complex.

clothes and appearance were not suspicious, and that the bag defendant carried was not suspicious in and of itself. Distilled to its essence, Officer Wood's testimony articulates three facts which arguably create a reasonable suspicion to support an investigative stop: 1) the time of day defendant was observed; 2) prior criminal activity in the area; and 3) the pace at which defendant entered and exited the scene. The court will address these facts in turn.

■ The time of day during which behavior is observed is a factor that is properly considered in analyzing reasonable suspicion. *See, e.g., United States v. Briggman,* 931 F.2d 705 (11th Cir.1991). Nighttime activity per se, however, is not sufficient to create reasonable suspicion of criminal activity. *United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir.1992) (*citing Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979)). This is especially true when such activity occurs in a residential setting. One prominent commentator has noted:

> As for suspicion of burglary of residential premises, something more than presence in immediate proximity to those premises will ordinarily be required, for persons have occasion to enter and exit their residence at all hours. This is not to suggest, however, that the time of day is unimportant; conduct which might be deemed innocuous in the daytime might be viewed otherwise at night. Even at night, however, something in the way of suspicious conduct should be present, such as stealthy movements, the apparent casing of the premises, efforts to conceal one's presence from passersby, flight from the premises, or other conduct which would not ordinarily be expected from a person who resided there, unless the suspect resembles a description given with respect to prior burglaries.

LaFave, Search and Seizure, § 9.3(c) at 441–42. *United States v. Briggman, supra,* illustrates this point. There, the fact that the defendant was observed at 4:00 a.m. was a factor in the Eleventh Circuit's finding of reasonable suspicion. *Briggman,* 931 F.2d at 709. However, two additional factors, not present in the case at bar, were key to the court's conclusion that the stop of the defendant was proper. First, the defendant was observed in the parking lot of a *business* that had been closed for hours. *Id.* As LaFave notes, late night presence at a closed place of business is inherently more suspicious than late night presence at a residence. Second, and more importantly, suspicious conduct beyond mere presence at an odd hour was involved—the defendant attempted to flee the scene when the police approached. *Id.* Here, defendant engaged in no such conduct.

■ Like time of day, previous criminal activity in a particular area is not a sufficient basis for a finding of reasonable suspicion. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."). Though relevant to the court's analysis, both time of day and the level of criminal activity in the area are, by definition, facts which focus on defendant's surroundings rather than on the defendant himself. Consequently, an additional fact or facts particular to defendant's behavior is required to justify a suspicion of criminal conduct. *See Cortez,* 449 U.S. at 418, 101 S.Ct. at 695 (officer must have "suspicion that the *particular individual* being stopped is engaged in wrongdoing.") (emphasis added).

In this case, no additional fact is present. Officer Wood did state that defendant appeared to be in a hurry. Defendant's pace, however, is qualitatively different from those types of suspicious conduct traditionally used to distinguish potential criminals from mere residents; *e.g.,* apparent casing, flight, or stealthy movements. *See* LaFave, *supra.* Moreover, although he described the speed of defendant's vehicle as it entered the apartment complex as "pretty rapid," Officer Wood neither issued defendant a citation for speeding nor questioned him about his speed. Officer Wood asked defendant no questions about why he entered and exited the building quickly. In light of the totality of the circumstances, the court finds that the fact that defendant moved quickly is not enough to push this case over the reasonable suspicion hurdle.

As noted earlier in this Order, reasonable suspicion analysis is not governed by a precise formula and must proceed on a fact-

specific, case by case basis. Nonetheless, it is instructive to examine a range of cases decided by appellate courts in order to get a sense of where the present case fits in that range. Such an examination bolsters the court's conclusion that the investigative stop at issue here was not proper.

At one end of the spectrum are cases such as *United States v. Knox,* 950 F.2d 516 (8th Cir.1991). There, the Eighth Circuit upheld a *Terry* stop where police officers found a car, its engine running, parked in an alley of an apartment complex in a high crime neighborhood at night. The officers followed footprints leading from the car to a security door in an apartment building which had been propped open. *Id.* at 519. The officers subsequently stopped defendant as he exited the building through the security door. *Id.* The strong possibility of an illegal entry into the building coupled with the footprints and a car left in a position that would facilitate flight most saliently distinguish *Knox* from the instant case. Similarly, more compelling facts were presented in *United States v. Briggman,* 931 F.2d 705 (11th Cir.1991). As explained above, the *Briggman* court's finding of reasonable suspicion was supported by late night presence in a commercial, rather than residential, area as well as flight from the police. *Id.* at 709.[2]

At the other end of the spectrum are cases such as *United States v. Smith,* 799 F.2d 704 (11th Cir.1986). There, the Eleventh Circuit found that officers acted unreasonably when they stopped two men driving a car with an out-of-state license plate on Interstate 95 in Florida at 3:00 a.m. In addition to the license plate, the officers relied on the fact that the car was being driven below the posted speed limit, a supposed indication of overcautiousness on the part of the driver. *Id.* at 707. The court stated that

> [e]xcept perhaps for the time of day, the few factors relied upon by Trooper Vogel would likely apply to a considerable number of those traveling for perfectly legitimate purposes along Interstate 95. Yet, that travelers should choose to journey at night ... does not reasonably provide any more suspicion of criminal activity than do the other factors cited by Trooper Vogel.

*Id.* Similarly, in *United States v. Thompson,* 712 F.2d 1356 (11th Cir.1983), the Eleventh Circuit found that the stop of an individual in a car in an airport parking lot was unreasonable. There, an officer observed a man in a car that had been parked in a short-term parking lot for more than two weeks. *Id.* at 1358. The officer knew the man was not the owner of the car. *Id.* at 1361. As he approached the car, the officer observed the man hold a circular object to his nose and then place the object in his lap and screw a lid on it. *Id.* at 1358. Upon seeing the officer approaching, the man quickly moved the object to his side. *Id.* A subsequent search of the object revealed that it was a vial of cocaine. *Id.* The court concluded that "the facts of which [the officer] was aware ... were insufficient to support a reasonable suspicion of criminal activity." *Id.* at 1361.

Viewed in comparison to the fact patterns presented in *Knox, Briggman, Smith,* and *Thompson,* the facts known to Officer Wood in the instant case fall well short of supporting an objectively reasonable suspicion of criminal activity. Thus, the court disagrees with the magistrate judge's conclusion that the circumstances justified the stop of defendant. At most, the facts give rise to the kind of inarticulate hunch of illegal activity denounced in *Terry.* The jurisprudence of this and other circuit courts of appeals makes clear that something more compelling than the conduct observed by Officer Wood is necessary to justify an intrusion by law enforcement into the private lives of citizens.

**B. Seizure and Search of the Bag in Defendant's Car**

 During the course of the investigative stop, Officer Wood observed a bag on the floor board of the vehicle. He asked if defendant "would have a problem with [Officer Wood's] looking at it." Transcript, at 9. Defendant responded by handing the bag to Officer Wood, at which point Wood searched the bag and found that it contained mail addressed to persons other than defendant. In light of this court's finding that the stop was unlawful, the court must next determine

---

2. *See* discussion of *Briggman, supra.*

whether defendant's consent to search the bag was valid. The magistrate judge concluded that defendant's consent was voluntary under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), but that conclusion does not end the inquiry. In addition to being voluntary, the consent must also be untainted by the prior illegality. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).[3]

In *United States v. Thompson, supra,* the Eleventh Circuit examined three factors articulated by the Supreme Court in order to determine whether a defendant's consent to search is tainted by an illegal detention: "(1) the temporal proximity of the illegal detention and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Thompson,* 712 F.2d at 1361–62, (*citing Taylor, supra,* 457 U.S. at 698, 102 S.Ct. at 2671). The *Thompson* court found that the actions of the officer in seizing the defendant as he sat in his car parked at the airport could "not be justifiably described as flagrant," but that the timing involved in obtaining consent and the absence of intervening circumstances were sufficient to warrant suppression of the evidence seized during the consent search. *Id.* at 1362.

The facts in the instant case are substantially similar to those presented to the Eleventh Circuit in *Thompson.* First, defendant's consent came within fifteen minutes of the initiation of the illegal stop and occurred while defendant remained illegally detained. Transcript, at 9. Second, there were no intervening circumstances between the initiation of the illegal detention and the consent. Third, Officer Wood's stop of defendant was far less justifiable than the unlawful stop at issue in *Thompson.* In *Thompson,* the officer observed the defendant hold a vial to his nose and then furtively place it out of view. By comparison, the behavior observed by Officer Wood was not nearly so suspicious.

Finally, it is significant that defendant was not informed of his right to refuse to consent or to consult with an attorney; nor was he allowed any appreciable time to decide whether to give his consent. *See United States v. Valdez,* 931 F.2d 1448 (11th Cir. 1991) (consent was fruit of illegal stop where defendant was not given time to reflect on whether to give consent and not informed of the right to refuse or to consult with an attorney). Considering the totality of the circumstances, therefore, the court finds that defendant's consent was tainted by the illegal detention and that the evidence seized pursuant to the consent search must be suppressed.[4]

## C. First Search of Michelle Davis's Apartment

During the unlawful detention of defendant, Officer Wood learned that defendant was on his way to visit Michelle Davis in apartment L–20 of an adjacent apartment complex. After placing defendant under arrest, Officer Wood and two other officers went to Davis's apartment where they learned that defendant was Davis's fiance and also resided there. Wood told Davis that defendant had been arrested on "credit card related theft type charges" and asked if she would consent to a search of the apartment in connection with those charges. Transcript, at 12. Davis refused. Officer Wood then explained to Davis that

> that was well within her right and that … in this particular circumstance I was going to search the apartment and I was going to do it with a search warrant if she did not give me consent.… I explained to her that we were going to secure the apartment while I went and obtained my search warrant.

*Id.* Officer Wood further told Davis that he "would have an officer sit with her until [he] obtain[ed his] warrant." *Id.* at 35.[5] Ulti-

---

**3.** Because he found that the initial stop was lawful, the magistrate judge did not reach this issue.

**4.** An analysis of the law governing automobile searches and searches incident to arrest is not called for here. Officer Wood only discovered probable cause to arrest defendant *after* searching the bag of stolen mail. To use that discovery

to justify a search of the entire vehicle would put the proverbial cart before the horse.

**5.** The court notes that Officer Wood's recollection of the circumstances surrounding the search of Davis's apartment differs significantly from Davis's recollection. According to Davis, Officer Wood threatened to arrest her if she did not

mately, Davis consented to the search. The court must now determine whether the items seized during that search should be suppressed.

Evidence obtained indirectly through the use of prior illegal conduct, often labeled "fruit of the poisonous tree," is generally inadmissible in a criminal trial. *See Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). An exception to this general rule applies when the link between the illegal conduct and the secondary evidence is sufficiently attenuated to purge the evidence of any taint. The relevant inquiry in attenuation analysis is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (*quoting* Maguire, Evidence of Guilt, 221 (1959)).

The Supreme Court identified three factors bearing upon attenuation in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). There, an illegal search led to the discovery of a witness who later testified willingly against the defendant. To determine whether the connection between the illegal search and the witness's testimony had been sufficiently attenuated, the court examined the "length" of the causal chain, the degree of free will exercised by the witness, and the efficacy of exclusion as a deterrent on the type of illegal behavior at issue. *Id.* at 275–80, 98 S.Ct. at 1059–62. After stating that no single factor was dispositive, the Court concluded that analysis of these factors required admission of the witness's testimony. *Id.* at 279, 98 S.Ct. at 1061. These same factors require suppression in the instant case.

### 1. Length of the Causal Chain

While acknowledging that the road between the illegal search and the witness's testimony was "both straight and uninterrupted," the Court in *Ceccolini* placed heavy emphasis on the fact that the road was long. *Id.* at 275, 98 S.Ct. at 1059. Four months passed between the search and the initial interview with the witness; an additional month or so elapsed before she testified at trial. *Id.* at 272, 98 S.Ct. at 1058. The instant case is like *Ceccolini* insofar as the road between the illegal stop of defendant and Officer Wood's request to search Davis's apartment was straight and uninterrupted. Unlike *Ceccolini,* however, the road was also remarkably short. Defendant was stopped just a short distance from the apartment. Officer Wood went to the apartment immediately after he placed defendant under arrest. The stop and the request for consent from Davis were each part of the same, seamless scene that unfolded over less than an hour. Thus, passage of time is not an attenuating factor in this case.

### 2. Voluntariness and Validity of Davis's Consent

In *Ceccolini,* the Supreme Court stressed that the witness discovered through unlawful means was willing and eager to testify. *Id.* at 279, 98 S.Ct. at 1061. This willingness helped purge the taint that resulted from the prior illegality. In the instant case, the magistrate judge concluded that, under the totality of the circumstances, Michelle Davis's consent was given voluntarily. This conclusion, however, was premised on the erroneous assumption that the stop of defendant had been lawful. This court's finding that the stop of defendant was unlawful significantly changes the voluntariness analysis.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973), the Court stated that "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." Thus, courts are required to "sift[ ] the unique facts and circumstances of each case" in order to make a voluntariness determination. *Id.* No single criterion is dispositive. *Id.* at 226, 93 S.Ct. at 2047. In the instant case, the magistrate judge relied on the ab-

---

cooperate. Transcript, at 79. The court does not need to settle this dispute, for the result is the same regardless of whose version of events is believed. For purposes of analyzing the lawful-

ness of the search of the apartment, the court will assume, as did the magistrate judge, that Officer Wood's testimony was accurate.

sence of police coercion, Davis's awareness of her right to refuse to consent, and Davis's education and intelligence as the basis for his finding of voluntariness. R & R at 15. As will be explained below, this court finds that the police officers' conduct was coercive and that, despite Davis's intelligence, her consent was not only involuntary, but was itself a product of the illegal seizure of defendant. Three factors in particular—the officer's threat to obtain a warrant, the exploitation of his prior illegal conduct, and Davis's prior refusal to consent—compel this conclusion.

a. The Effect of Officer Wood's Threat to Obtain a Warrant on Davis's Consent

■ Dicta in cases from the Eleventh and the former Fifth Circuits suggest that the way an officer presents the possibility of a with-warrant search is an important factor to be included in a court's analysis of the circumstances bearing upon voluntariness. Specifically, whether an officer states that he *will obtain,* or merely *attempt to obtain* a warrant can have an impact on the nature of the consent that results. Although the Supreme Court has not addressed the issue directly, its decision in *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), supports this distinction. There, the Court found that consent given after officers had announced that they were in possession of a search warrant was not valid. *Id.* at 548, 88 S.Ct. at 1791. The Court stated that

> [w]hen an officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion, there can be no consent.

*Id.* at 550, 88 S.Ct. at 1792. This reasoning also applies to circumstances in which an officer states that he will obtain, rather than seek or apply for, a warrant. *See* LaFave, Search and Seizure, Vol. 3, § 8.2(c) at 187 (threat to obtain a warrant, especially where warrant could not issue, is not markedly different from situation presented in *Bumper*). As noted by the concurring judge in *United States v. Faruolo,* 506 F.2d 490 (2nd Cir.1974), "[a]ny intimation that the warrant will automatically be issued should be consid-

ered as coercive as the announcement of an invalid warrant in *Bumper."* Case law from this circuit echoes this position.

For example, in *United States v. White,* 617 F.2d 1131 (5th Cir.1980), a panel of the former Fifth Circuit found that the defendant's consent to search his van was given voluntarily, notwithstanding the fact that one of the investigating agents had made reference to the possibility of obtaining a warrant. The defendant contested the trial court's finding of voluntariness and cited language from *United States v. Boukater,* 409 F.2d 537 (5th Cir.1969), which suggested that consent "might not be voluntary if the agent either said or implied that defendant might as well consent because a warrant could be quickly obtained if he refused." *White,* 617 F.2d at 1134. In support of its conclusion that the defendant's consent was voluntary, the *White* court stressed the fact that the "agent did not say or imply that defendant may as well consent because a warrant could be easily obtained." *Id.* Rather, the agent explained that "he could not automatically get a search warrant but would have to show probable cause to a magistrate." *Id.*

More recently, in *United States v. Garcia,* 890 F.2d 355 (11th Cir.1989), the Eleventh Circuit reviewed a lower court's finding that consent to search was not voluntary. There, the trial court had emphasized the fact that the defendant consented to a full search of his home only after officers refused to accept his consent to a limited search and stated that they would attempt to procure a search warrant. The Eleventh Circuit panel reversed the trial judge's decision to suppress the fruits of the search, noting

> that defendant intensely cross-examined [the] officer ... regarding whether [defendant] was told that the agents *would* obtain a warrant or only attempt to obtain a warrant. [The] officer ... testified that he informed [defendant] that they would attempt to procure a warrant. [cits. omitted]. Hence, defendant cannot argue that Garcia consented as a result of a claim of lawful authority to search. *Cf. Bumper v. North Carolina,* 391 U.S. 543 [88 S.Ct. 1788, 20 L.Ed.2d 797] (parallel cits. omitted) (1968) (consent involuntary when offi-

cials requesting search mendaciously claim that they are in possession of a warrant). *Id.* at n. 7, 88 S.Ct. at 1790 n. 7. Unlike *Garcia,* however, Davis's consent in the instant case was a result of Officer Wood's claim of authority.

Officer Wood's testimony makes plain that he did not tell Davis that he would *apply* for a warrant or *attempt* to obtain a warrant. Rather, he told Davis in no uncertain terms that he "was going to search the apartment" and that he "was going to do it with a search warrant if she did not give [him] consent." Transcript, at 12. Thus, Officer Wood implied that he had authority to search and that a warrant would issue automatically. Just as the officers did in *Bumper,* Officer Wood made the search appear to be a *fait accompli* and made withholding consent appear to be a futile gesture. Moreover, Officer Wood made clear that withholding consent would not only result in a with-warrant search, but would also bring with it the added intrusion of an officer's presence with Davis in her home while a warrant was being secured. Although the court does not decide that the way Officer Wood presented the possibility of a search pursuant to a warrant is, in itself, dispositive of the issue of voluntariness, the court notes that it is a factor which strongly suggests that Davis's consent was not given freely.

### b. The Effect of the Prior Illegality on Davis's Consent

 The coercive effect of Officer Wood's statement that he would search the apartment with a warrant is exacerbated by the fact that he could not obtain a warrant. Because the initial stop of defendant was unlawful, Officer Wood did not have probable cause upon which a warrant could issue at the time he sought Davis's consent.[6] This lack of probable cause notwithstanding, Officer Wood told Davis that he "was going to search the apartment and [he] was going to do it with a search warrant if she did not give [him] consent." Transcript, at 12. Thus, as

explained above, Officer Wood made Davis's "choice" between protecting her privacy or consenting to a search appear to be no choice at all. Although the former Fifth Circuit deferred deciding whether the accuracy of the information presented to an individual in Davis's shoes is, in itself, dispositive,[7] it is obviously relevant to the issue of voluntariness. *Compare Bumper,* 391 U.S. at 548, 88 S.Ct. at 1791 (consent involuntary when officials requesting search mendaciously claim that they are in possession of a warrant); *see also United States v. Anderson,* 752 F.Supp. 565, 568 (E.D.N.Y.1990), *aff'd* 929 F.2d 96 (2nd Cir.1991) ("where law enforcement officer represents that he will apply for, or obtain, a warrant under circumstances in which it could not be obtained, the consent to search is involuntary."). Wood's statement plainly mislead Davis about her ability to protect her privacy. Without opining about Officer Wood's subjective belief regarding his ability to obtain a warrant, the court simply notes that Wood clearly intended to lead Davis to believe that resistance was futile and that he had lawful authority to search her apartment, with or without Davis's consent. These circumstances militate strongly toward a finding that Davis's consent was not a product of her own free will, but rather was induced via exploitation of the prior illegal detention of defendant.

### c. The Effect of Davis's Prior Refusal on her Consent

Also of importance to the court's voluntariness analysis is the fact that Davis initially refused to consent to a search of her apartment. *See United States v. Pulvano,* 629 F.2d 1151, 1157 (5th Cir.1980) (prior refusal to consent is a factor to be considered, but not determinative). Davis's prior refusal puts into perspective the impact of Officer Wood's statements to her. Davis acquiesced only after Wood made clear that incriminating evidence had been seized from defendant, that officers *would* search the apartment with or without Davis's consent, and

---

6. That probable cause cannot be based on illegally seized evidence is an elementary and fundamental fact of Fourth Amendment jurisprudence. *See, e.g., Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988) (evidence seized pursuant to a warrant

search would be inadmissible if unlawfully obtained evidence had influenced magistrate's decision to issue warrant).

7. *See United States v. White,* 617 F.2d at 1134.

that officers would remain with Davis if she insisted that they procure a warrant. Davis's prior refusal highlights the fact that Officer Wood's assertion of authority was the driving force behind her decision to yield.

Each of the factors explained above lead the court to conclude that Davis's consent was both involuntary under the totality of the circumstances and invalid as a product of the earlier unlawful conduct. In reaching the opposite conclusion, the magistrate judge correctly noted that Davis is an educated and intelligent individual who was informed of her right to refuse to give consent. Viewed in light of all the circumstances, however, neither her intelligence nor her education compensates for the fact that a law enforcement officer exploited an illegal seizure to convince Davis that he had authority to search her apartment and that her refusal to permit him to do so was in vain. To the contrary, these facts present the kind of "colorably lawful coercion" which the *Bumper* Court held vitiates consent. *See Bumper,* 391 U.S. at 550, 88 S.Ct. at 1792.

### 3. Deterrent Function of the Exclusionary Rule

 Having addressed the issues of voluntariness and the length of the causal chain, the court now turns to the final factor used by the *Ceccolini* Court in its attenuation analysis—the value of suppression as a deterrent of future police misconduct. The Court held that "considerations relating to the exclusionary rule and the constitutional principles which it is designed to protect must play a factor in the attenuation analysis." *Ceccolini,* 435 U.S. at 279, 98 S.Ct. at 1061. Thus, where suppression is an effective deterrent, courts should be less likely to find sufficient attenuation to purge the taint.

 The facts of the instant case show that suppression of the seized evidence would further the deterrent function of the exclusionary rule in two ways. First, suppression would deter the type of unwarranted stop that began the series of events that led the

officers to Davis's apartment. Officer Wood's stop of defendant was not based on reasonable suspicion and was intended to uncover evidence of wrongdoing. Without suppression, officers would be encouraged to conduct investigative stops unsupported by reasonable suspicion in the hope of acquiring admissible, secondary evidence.[8] Second, and more importantly, suppression would deter the exploitation of illegally acquired evidence in inducing consent to search. Officer Wood testified that an officer on the scene communicated with a magistrate judge for the purpose of charging defendant with the proper offense. Transcript, at 34. Yet, no one attempted to procure a warrant to search the apartment.[9] Rather than pursuing a warrant, Officer Wood went to Davis's apartment with the express purpose of obtaining her consent. In the process, he exploited to the fullest the advantage he gained through the illegal stop of defendant by convincing Davis that insistence on a warrant was futile. Suppression is required to deter this kind of strategic and intentional conduct.

Although "no mathematical weight can be assigned to any of the factors" discussed above, they each point to the conclusion that the evidence seized pursuant to the consent search of Davis's apartment is tainted. *Compare Ceccolini,* 435 U.S. at 280, 98 S.Ct. at 1062. Common sense also supports this conclusion. Davis's consent and the evidence found in her apartment were the product of Officer Wood's exploitation of his prior illegal conduct. Neither Davis's consent nor the seized evidence is distinguishable from that illegality. The evidence, therefore, must be suppressed.

### D. Second Search of Michelle Davis's Apartment

 Several hours after the initial search of Davis's apartment, a number of officers returned and obtained Davis's consent to search a second time. Pretermitting the question of whether Davis's consent to the second search was voluntary under *Schneck-*

---

8. Suppression has the related salutary effect of making clear, if there was any doubt, that the conduct of the officer in this case falls below the somewhat nebulous reasonable suspicion hurdle.

9. It is well settled "that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio,* 392 U.S. at 20, 88 S.Ct. at 1879; *see also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

*loth, supra,* the court finds that her consent is not *valid* under *Wong Sun* because it was procured in exploitation of the earlier, unlawful search of the apartment. The Supreme Court's decision in *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), a case which analyzed the independent source exception to the fruit of the poisonous tree doctrine, illustrates why this is so.

In *Murray,* officers illegally entered a warehouse, then reentered pursuant to a warrant. *Id.* at 535–36, 108 S.Ct. at 2532–33. The Court, per Justice Scalia, found that the evidence seized during the second search would not be admissible if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant. *Id.* at 542, 108 S.Ct. at 2536. In the instant case, the explicit motivation for returning to the apartment to seek Davis's consent for a second search was the evidence seized during the first, unlawful search. Having found some incriminating evidence, the officers returned to find more. *See United States v. Hearn,* 496 F.2d 236 (6th Cir.1974) (where illegal search, unknown to defendant, led police to subsequently seek defendant's consent to search, evidence seized was exploitation of prior illegality). Moreover, the unlawfully obtained evidence clearly affected Davis's decision to consent to the second search. She testified that she did not resist the second search "because they had done the first search. . . . I was basically tired, just trying to get it over with." Transcript, at 82. Opposition to a second search quite understandably appeared futile to Davis since her earlier attempt to protect her privacy had failed and the cat was already out of the bag. The second search of Davis's apartment is inextricably linked to the prior illegality, and no intervening circumstances are presented which would attenuate that link. Pursuant to the Supreme Court's teaching in *Wong Sun,* therefore, the evidence seized during the second search must be suppressed.

*Conclusion*

Accordingly, Magistrate Judge Richard H. Deane's Report and Recommendation [# 18–1] is APPROVED and ADOPTED IN PART and DISAPPROVED IN PART. Defendant's objections to the R & R [# 21–1] are SUSTAINED IN PART AND OVERRULED IN PART. Defendant's motion to suppress evidence obtained as a result of the searches of defendant's car and apartment [# 12–1] is GRANTED and the parties' motion for an extension of time to file briefs [# 16–1] is GRANTED IN PART and DENIED IN PART as explained in the R & R.

SO ORDERED.