UNITED STATES of America

v.

Brian HOSPEDALES, Jamar
Watson, Jeremy Martin,
and Willie Knight

Nos. 2:01–CR–107–1, 2:02–CR–107–2,
2:02–CR–107–4, 2:02–CR–107–5.

United States District Court,
D. Vermont.

Sept. 20, 2002.

Robert W. Katims, Hoff, Curtis, Burlington, VT, for Brian Hospedales, defendant.

Mark Alan Kaplan, Jarvis & Kaplan, Burlington, VT, Kerry B. DeWolfe, Esq., Rubin, Kidney, Myer & DeWolfe, Barre, VT, for Jamar Watson, defendant.

Douglas Gary Kallen, Bergeron, Paradis & Fitzpatrick, LLP, Burlington, VT, for Jeremy Martin, defendant.

Ernest Marvin Allen, III, Stetler, Allen & Kampmann, Burlington, VT, for Willie Knight aka William. Knight, defendant.

Carol L. Shea, AUSA, Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S. Attorneys.

## OPINION AND ORDER

SESSIONS, Chief Judge.

The Grand Jury returned a multiple count indictment against Defendants Brian Hospedales ("Hospedales"), Jamar Watson ("Watson"), Jeremy Martin ("Martin"), and Willie Knight ("Knight"), charging them with conspiring to distribute cocaine. Each defendant filed a motion to suppress evidence in which he objects to the introduction of evidence obtained by the Government at the time of his arrest in July, 2001, together with any statements he may have made at a later time. Specifically, Hospedales filed a Motion to Suppress and Dismiss (paper 67) in which he claims that his initial detention and subsequent arrest violated the Fourth Amendment. Watson filed a Motion to Suppress (paper 75) on the same grounds, but added an additional argument regarding the existence and voluntariness of his consent to search his backpack. Martin filed a Motion to Suppress Statements and Evidence (paper 40) in which he asserts, in essence, the agents did not have probable cause to arrest him. Knight filed two motions to suppress in which he claims his statements were made

involuntarily and in violation of the due process clause. The Court will address each of the Defendants' motions in turn.

## I. Findings of Fact

A number of agents with the U.S. Drug Enforcement Administration ("DEA") Task Force ("Task Force") were conducting surveillance in an unrelated investigation at the Vermont Transit bus station in the early evening hours of July 19, 2001. At about 7 p.m. DEA Agent Thomas Doud and Special Agent Christopher Destito of the FBI were in a parked, unmarked vehicle in the lot. Both agents were in plainclothes. At that time, a car operated by Brian Cauchon entered the parking lot, passing in front of the vehicle in which Destito and Doud were sitting. Hospedales was in the front passenger seat of the Cauchon vehicle. Cauchon is a young, Caucasian male, and Hospedales is African–American. As the Cauchon vehicle passed Agents Doud and Destito, Hospedales appeared concerned when he spotted the two agents. He looked anxiously in their direction, then began using his cell phone. The Cauchon vehicle went to the far southeast corner of the lot, a significant distance from the station, and parked.

Both agents commented that Hospedales was staring at them and that he appeared nervous. Doud then ran a record check on the vehicle, learning that its owner was Johanna Cauchon of Burlington, Vermont. Doud was familiar with the Cauchon name, since he knew of at least three individuals in the Burlington area named Cauchon who had a history of involvement in illicit drug use. The agents also knew that persons transporting drugs often use buses traveling from New York City to Vermont.

Hospedales and Cauchon walked to the platform alongside of the bus station. They remained on the platform for 10 to 15 minutes. Hospedales continued to stare at the agents' vehicle, appearing nervous. Their behavior aroused the suspicions of Doud and Destito and other agents in the area, including Task Force Agent Ken Beaulieu.

Jamar Watson arrived on the next bus from New York City. The bus pulled into the station beside the platform. Cauchon returned to his vehicle. Hospedales walked around the bus, toward the rear driver's side, and waited. Watson, who is also a young, African–American male, exited without looking in any direction and headed toward the rear of the bus where Hospedales was waiting. Meanwhile, Agent Doud had gotten out of his vehicle and headed for the platform. He observed Hospedales and Watson conversing as if they knew each other and he approached them. Doud identified himself as a federal agent and asked Watson to walk with him a short distance away so that he could ask him some questions. Watson agreed to speak with Doud. Meanwhile, Hospedales appeared to begin moving away and was approached by Beaulieu, who identified himself. Beaulieu approached Hospedales, but did not ask him to move. Beaulieu told him to stay in one spot and remain still so that he could watch Doud and Watson. Hospedales agreed to speak with the agent.

Beaulieu's interview with Hospedales lasted 5 to 10 minutes. Hospedales continued to appear nervous. He was pacing back and forth and sweating profusely. His speech patterns were irregular, with long pauses. He told Beaulieu he was there waiting for his girlfriend who was supposed to be on the bus, but he did not know her last name. No girlfriend emerged. He said his girlfriend worked at IBM and had been transferred to Fishkill, New York. In fact, Beaulieu knew that IBM employees from Fishkill were being transferred to the Essex, Vermont plant.

Hospedales denied knowing Watson. He gave identification which could not be verified. Hospedales then became verbally belligerent, although Beaulieu did not, at any time, attempt to restrain him. Beaulieu placed him under arrest only after he was instructed to do so by Agent Doud once Doud had discovered the cocaine in Watson's backpack.

Doud's exchange with Watson was also brief. Watson appeared to be nervous during the interview. He repeatedly looked downward to avoid direct eye contact. Watson said he had no identification. He told Doud he was traveling to Burlington to visit a cousin, Bobbi Jo Lowell. Lowell was known by the agents to be actively involved in the drug trade. She was also known to be Caucasian. Watson was unable to tell Doud the last name of his aunt, although he could identify her first name. He said he was staying in Burlington for two weeks but only had a small knapsack. Watson also gave Doud a false name, Jamal Wilkins.

Watson asked Doud what he wanted. Doud questioned him as to whether he had any drugs. Watson said he had smoked marijuana on the bus ride from New York but had no other drugs. Doud asked for permission to search his backpack. Watson answered in the affirmative, saying that if there were any drugs in the backpack, those drugs did not belong to him. Doud then opened the backpack while Agent Destito approached. He found a baseball-sized package. Doud said the package must weigh at least three quarters of a pound. Watson replied there was no way it weighed that much. Doud then placed Watson under arrest and ordered that Beaulieu arrest Hospedales.

Doud transported Watson to DEA headquarters. During the trip, Doud explained "cooperation" with the DEA. No statements were taken en route to the office. Miranda rights were given to Watson by Agent Destito at the DEA office. Watson waived his rights and agreed to speak. Initially he remained untruthful. When confronted by Agent Doud with his true identity, he chose to cooperate with the DEA. He explained his participation with Hospedales and that he intended to sell some of the cocaine to Lowell. Eventually he made monitored telephone calls to Lowell to arrange for the sales.

Agents also gave Hospedales Miranda rights at the DEA office. Hospedales indicated that he understood his rights and waived them. He then agreed to cooperate with the Task Force. He identified two persons who were intended purchasers of the cocaine, Jeremy and Willie. Those persons were later identified as Jeremy Martin and Willie Knight.

Hospedales made a series of monitored telephone calls to Martin. His first call involved leaving a message on Martin's answering machine. The second call was made after 1 a.m. on July 20th. Hospedales said he was at the Shanty Restaurant and was able to supply him with drugs. Through code, Hospedales asked whether Martin wished to purchase one or two ounces. Martin said he wanted two ounces but needed fifteen minutes to make some telephone calls. Hospedales and Martin then had a third conversation fifteen minutes after the second call in which Martin agreed to be at the Shanty within 5 minutes. He said he would be in a Volkswagen. Agents also heard a female voice at Martin's end of the exchange.

Martin arrived at the area of the Shanty Restaurant within a few minutes. He was a passenger in a Volkswagen driven by a young woman. They passed slowly by the restaurant, then turned around and approached it again. Law enforcement officers observed the vehicle pass, stopped the car, and placed Martin under arrest at gunpoint.

Agents took Martin to DEA headquarters soon after the arrest. He identified himself as Jeremy Martin. Martin was given Miranda rights and agreed to speak with the agents. He never indicated that he wished to speak with a lawyer. At first he became agitated and confrontational. In the presence of Agent Destito, however, he calmed down. They had a lengthy conversation, during which Martin asked if he should talk with a lawyer. Destito refused to answer the question, telling Martin that such a decision was his to make. Martin said he had nothing to do with distributing cocaine. The interview was then terminated, and he was lodged for the night at the Northwest State Correctional Facility in St. Albans, Vermont.

On the following day, Agent Doud transported Martin to the federal courthouse. During the trip, Martin said he wanted to cooperate. He acknowledged being involved in the conspiracy. He was not given Miranda rights during the trip, nor did he indicate that he wished to speak with a lawyer. He was released on that day. Although Martin expressed an interest in cooperation, his counsel later contacted the Task Force and informed them of his representation. Martin had no further contact with the agents.

Hospedales also contacted Knight that evening in a monitored telephone call. They arranged for Knight to meet Hospedales at his hotel on Knight's way to work the next day. Knight agreed to purchase two ounces of cocaine. On the following morning, Knight called Hospedales again and arranged to meet him at Room 206 of the Anchorage Inn. Agents arrested Knight when he arrived at that room.

Agent Destito transported Knight to DEA headquarters following the arrest. En route, Knight said that he could not go to jail. Destito then told him about the possible benefits of cooperation. Destito made no assurances or promises, but did say that usually cooperation is done best while someone is not incarcerated. Once they arrived at the DEA office, Destito gave him his Miranda rights. Knight waived those rights and agreed to speak with Destito. The conversation lasted for up to three hours. The atmosphere was cordial. Knight was permitted to call his employer to say that he would be late. Eventually, Knight was released.

## II. Hospedales' Motion to Suppress

Hospedales filed a motion to suppress and dismiss in which he objects to the introduction of statements made to law enforcement officers after his arrest. He claims that he was subjected to an illegal detention, both because the agents did not have reasonable cause to believe, based upon specific and articulable facts, that he was involved in illegal activities at the time of his detention, and because his detention extended for too long a duration. As to the length of the detention, he argues he should have been released once he made exculpatory statements prior to the discovery of cocaine in Watson's backpack.

■ At the outset, the Court notes Hospedales has no standing to object to search of Watson's backpack. He never asserted a possessory or privacy interest in the backpack that was searched or the drugs that were seized. *See Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). His motion relates only to his statements.

■ The threshold question is whether Hospedales was detained when first approached by agents outside of the bus or at some subsequent time prior to formal arrest, or whether the encounter was consensual for purposes of the Fourth Amendment. The Supreme Court addressed standards to be employed in making this determination in *Florida v. Bostick,* 501

U.S. 429, 439–40, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991):

> in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

To constitute a detention, there ordinarily must be a show of physical force constituting a seizure for Fourth Amendment purposes. *United States v. Springer,* 946 F.2d 1012, 1016 (2d Cir.1991). Law enforcement officers are justified in detaining an individual upon a showing of reasonable suspicion of criminal activity based upon specific and articulable facts. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Government relies upon *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) to argue that Hospedales was not detained and that his interview with Agent Beaulieu was consensual. Although not dispositive of the central issue of this motion, I disagree. This case is distinguishable from *Drayton* in significant ways. In *Drayton,* the police officers systematically moved through a bus and interviewed passengers. 122 S.Ct. at 2109–10. The officers were interviewing all the passengers and did not focus specifically upon the defendants. *Id.* Here, there were no other passengers being interviewed. The agents' questions were directed toward Hospedales and Watson. In such a case it is much more reasonable to conclude that one is detained than when one is being interviewed as part of a larger sweep operation.

The facts in this case are more similar to *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In *Royer,* county detectives stopped the defendant in the Miami airport because he fit a drug-courier profile. 460 U.S. at 493, 103 S.Ct. 1319. He was young, nervous, and had paid cash for a ticket to a target city, with luggage that appeared to be heavy. *Id.* at 493 n. 2, 103 S.Ct. 1319. The detectives asked him for identification and his airline ticket, which were provided. *Id.* at 494, 103 S.Ct. 1319. There was a discrepancy between the name on the defendant's ticket and the name on his identification, and he became very nervous. *Id.* The detectives, after identifying themselves, told the defendant that he was suspected of transporting narcotics and asked him to accompany them to a police room, while at the same time retaining his ticket and identification. *Id.* The Court found this kind of stop to be non-consensual, since a reasonable person would believe he or she was not free to leave. *Id.* at 501–02, 103 S.Ct. 1319.

In the instant case, agents approached the defendants with an identified purpose, that is to investigate whether they were involved in a drug transaction. At the point of the approach, the defendants were not detained. However, Doud acknowledged he asked Watson to move away from Hospedales as questions were being asked. Those questions were directed at specific criminal activity. Beaulieu also directed Hospedales as to where to stand. Based upon the totality of circumstances, the encounter evolved into a detention for purposes of the Fourth Amendment.

 Assuming, then, that Hospedales was detained prior to the discovery of the drugs, the next question is whether that detention is supported by reasonable suspicion. *See Florida v. Rodriguez,* 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). The Supreme Court addressed the concept of reasonable suspicion most recently in *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Courts

look to the totality of circumstances "to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." 122 S.Ct. at 750. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 750–51 (internal quotations omitted). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 751 (internal quotations omitted).

The Court finds that the agents had reasonable suspicion to believe Hospedales and Watson were engaged in criminal activity, that is, possessing or distributing illegal drugs. A number of factors contribute to that conclusion. Experienced law enforcement agents testified that couriers commonly bring drugs to Vermont from New York City by bus. Hospedales appeared to be nervous while on the platform, constantly looking in the direction of the agents. Those observations were confirmed once agents approached both defendants. Parking the car at the far southeast corner of the lot, far away from the platform, also contributed to their suspicions. When the bus arrived, Hospedales moved around to the rear rather than meet passengers as they exited. Watson's behavior as he exited the bus was also suspicious, in that he did not look around but headed in the direction of Hospedales. The fact that Hospedales and Watson appeared to converse as if they knew each other, yet met away from the rest of the passengers, created additional concern.

Hospedales' answers to Beaulieu's initial questions confirmed and heightened the agents' suspicions and justified continued questioning. Hospedales denied knowing Watson, although it appeared clear to the agents that they knew each other. He said he was there to meet his girlfriend, although no such person exited the bus. Moreover, if he had been there to meet his girlfriend, there was no explanation for his movement around the bus and away from where the passengers disembarked. His statement that his girlfriend was transferred to Fishkill by IBM was contradicted by the agent's knowledge that the opposite was true. Finally, he gave identification which could not be verified in any way.

The Court finds that Agent Beaulieu had reasonable suspicion to briefly detain Hospedales for questioning outside the bus. That reasonable suspicion existed when Beaulieu approached Hospedales and was confirmed as the interview progressed. Moreover, the detention lasted only 5 to 10 minutes. In no way can such a detention be considered excessive in length. Once the drugs were found in Watson's backpack, probable cause existed for the agents to arrest Hospedales. As a result, Hospedales' Motion to Suppress and Dismiss is denied.

## III. Watson's Motion to Suppress

Watson's motion to suppress raises the same questions as did Hospedales' motion. He alleges he was detained without reasonable suspicion, based upon specific and articulable facts, that he was engaged in criminal activity. This argument is without merit for the same reasons addressed above.

Watson also alleges he never gave consent for Agent Doud to search his backpack. The Government has the burden to establish that consent to search was voluntarily made. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Courts look to the totality of circumstances to assess voluntariness, such as the age, education, intelligence, and mental or physical condition of

the person, as well as the circumstances surrounding the consent, including the length of the detention, physical restraints used on the defendant, and whether he was advised of his right to refuse to consent. *Id.* at 226, 93 S.Ct. 2041.

■ Watson asks the Court to focus upon whether the defendant was advised of his Miranda rights prior to giving consent to the search. The Second Circuit, however, rejected that standard in *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974).

The Court finds that Watson's consent to the search of the backpack was freely, voluntarily, and knowingly made. The atmosphere of the encounter between Agent Doud and Watson was not coercive in any way. No threats or promises that may have prompted consent were made to Watson. There has been no showing that Watson suffers from any disability that would impair his right to give consent. To the contrary, his experience in the criminal justice system suggests knowledge of his right to refuse consent. As a result the Court denies Watson's Motion to Suppress.

**IV. Martin's Motion to Suppress**

Martin's Motion to Suppress raises a number of issues relating to statements made to law enforcement officers on July 20, 2001. First he claims the agents did not have probable cause to arrest him prior to being placed in custody and that his subsequent statements were fruits of that illegal arrest. Second, he seeks to suppress the statements, alleging that he has expressed a wish to speak with an attorney when given his rights the previous evening. Finally, he seeks to suppress the search of his safety deposit box pursuant to a search warrant issued by this Court, claiming that the warrant was not supported by probable cause and that the good faith exception under *United States*

*v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) does not apply. None of these arguments have merit.

Hospedales identified Martin as an intended purchaser of cocaine that evening. Hospedales made monitored telephone calls to Martin that evening to arrange for the delivery of the cocaine. In that conversation, Martin agreed to meet Hospedales in the area of the Shanty Restaurant in Burlington in the early morning hours of July 20th. They agreed that Hospedales would provide two ounces of cocaine. Martin said he would be down to the area of the Shanty Restaurant within five minutes of the last call. He identified the car in which he was to be a passenger as a Volkswagen.

A few minutes after this telephone call ended, a red Volkswagen approached the area of the restaurant. The vehicle passed by the Shanty Restaurant slowly, then turned around and came back to it. Agents then stopped the vehicle and arrested Martin. Search of Martin incident to the arrest yielded $2000 from the cargo pocket of his pants, together with quantities of marijuana and hashish from his backpack. The search also produced $486 from Martin's wallet and a safety deposit key, which ultimately led to the warrant that authorized search of Martin's safety deposit box. One thousand dollars, a metal key, and a card with a serial number were recovered in the safety deposit box.

■ Probable cause is defined as "where the facts and circumstances within [law enforcement officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (internal quotations omitted). It is an objective test based on

the totality of circumstances and must be "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

■ Probable cause to stop the Volkswagen and arrest Martin clearly existed. Agents had recovered a large quantity of cocaine earlier in the evening from Hospedales and Watson. Hospedales told them that the drugs were to be sold to a "Jeremy". The phone conversation confirmed the sale, and a Volkswagen arrived according to plan. Martin identified himself as "Jeremy," again confirming the suspicions of the agents. Martin's arrest was permissible, and the subsequent searches of Martin that evening were valid pursuant to the "search incident-to-arrest" exception to the warrant requirement. *See Knowles v. Iowa*, 525 U.S. 113, 116, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

■ Martin objects to statements made to Agent Doud on the way to the federal court, claiming that he had asked for an attorney the previous evening and that the subsequent interviews were constitutionally barred. Agent Doud had given Martin his Miranda rights soon after his arrest. Martin offered no proof of his assertion that he wished to terminate questioning until he spoke with a lawyer. The uncontradicted testimony at the suppression hearing was that he never asked for an attorney. Since Martin never asked to speak with a lawyer or terminate interrogation, either during the ride to the court or on the previous evening, his Miranda claim has no validity.

■ Martin's final claim relates to search of the safety deposit box. That search was made pursuant to this Court's search warrant issued following Martin's arrest. Martin's burden to suppress evidence obtained as a result of execution of a search warrant is a difficult one. Not only must he show that the warrant was not supported by probable cause, he also must establish that Agent Doud could not, in good faith, have relied upon issuance of the warrant. *Leon*, 468 U.S. at 922–23, 104 S.Ct. 3405.

■ Here, sufficient facts were presented to the Court to justify issuance of the warrant to search the safety deposit box. Agent Doud's experience involving hundreds of drug investigations established that safety deposit boxes are frequently used to secure drug records and proceeds. Agents knew from Hospedales that Martin had been purchasing one to two ounces of cocaine for several weeks. The safety deposit box had been used for slightly over one month. Martin had acknowledged his involvement in drug sales to Agent Doud. Based upon those representations, probable cause existed for search of the safety deposit box. Alternatively, even if probable cause had not existed, there is no evidence that Agent Doud acted in bad faith in executing the warrant. In fact he reasonably relied upon the warrant in searching the safety deposit box, so that the *Leon* good faith exception is applicable.

For the reasons cited above, Martin's motion to suppress is denied.

## V. Knight's Motions to Suppress and Dismiss

Knight filed two sets of motions. First he filed a motion to suppress statements made to agents on the morning of his arrest. He then filed another motion to suppress and dismiss, relying upon a novel theory of entrapment to justify suppression of his statements or, alternatively, a court order dismissing the indictment.

Since the second motion is more easily resolved, the Court will address it first.

Briefly, the facts are as follows. Following the arrest of Hospedales and Watson, agents asked them to identify the intended purchasers of the drugs. Hospedales identified Knight. Hospedales then made a monitored telephone call to Knight to arrange for the sale. The Government introduced the transcript of that telephone call. Hospedales and Knight arranged to pick up two ounces of cocaine the following morning, at Room 206 of the Anchorage Inn. Knight arrived at the Anchorage Inn the following morning and was arrested. Agents recovered $1430 in Knight's wallet.

Agent Destito transported Knight to DEA headquarters following his arrest. Destito advised Knight of his Miranda rights. Destito also explained the concept of cooperation with the DEA. Knight waived his Miranda rights and agreed to speak with Destito. However prior to being debriefed, Knight expressed fear of going to jail. Destito made no promises of leniency, nor did the agent express any assurances as to concrete benefits arising out of a waiver of his constitutional rights. The tone of the conversation was calm and unthreatening. However, Agent Destito did remind Knight that, if he was actively cooperating in the investigation, such cooperation could not occur while he was incarcerated. Knight then agreed to cooperate with the DEA and proceeded to make numerous incriminating statements.

■■■ Entrapment is a defense to a criminal charge by which a defendant contests his or her predisposition to commit the offense. *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *Id.* at 436, 93 S.Ct. 1637. Knight's motion to dismiss and suppress

relies on an alleged violation of his due process rights caused by entrapment. The due process clause may require suppression of evidence or dismissal of criminal charges if governmental conduct is particularly egregious, that is, sufficient to "shock[ ] the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In this case, the conduct of the agents was particularly professional and appropriate. Offering a defendant an opportunity to participate in pre-planned crimes is a widely accepted law enforcement practice and fully complies with the due process clause. *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Destito's interview with Knight was not coercive in any way. There being no evidence that law enforcement officers engaged in outrageous conduct, Knight's Motion to Dismiss and Suppress II is denied.

■■■ Knight's other motion to suppress is more complex. In that motion, Knight again relies upon the due process clause, arguing that he was given the stark choice of cooperation or incarceration in a police dominated atmosphere. Essentially, Knight argues that his waiver and subsequent confession were involuntary.

■■■ The Government has the burden to prove the voluntariness of a confession by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Courts look to a totality of circumstances to assess the voluntariness of a confession, including the characteristics of the defendant, the circumstances surrounding the statement, and the conduct of the agents. *Green v. Scully,* 850 F.2d 894, 901–02 (2d Cir.1988). Courts consider "the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical

542

punishment." *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989).

 The Second Circuit has held uniformly that agents may discuss cooperation with a defendant without necessarily impacting the voluntariness of a subsequent confession. *See United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir.1989); *United States v. Alvarado*, 882 F.2d 645, 650 (2d Cir.1989). A statement that cooperation may be beneficial to a defendant does not invalidate a subsequent confession. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir.1995).

The evidence does not support Knight's due process claim. En route to DEA headquarters, Agent Destito fully advised Knight of his Miranda rights, while also explaining the concept of cooperation. He used no deception and made no promises in return for Knight's cooperation. The subsequent interview at DEA headquarters was conducted in a non-threatening and non-coercive environment. Knight was not restrained in any way. During the relatively brief, two hour interview he was able to contact his employer.

There also is nothing in Knight's behavior or characteristics which suggests that his will was overborne or that he acted involuntarily in waiving his rights and speaking with law enforcement officers. Knight has had experience in the criminal justice system involving a prior arrest and conviction for a drug offense. He told Destito that he fully understood his Miranda rights. There is no indication that he suffers from low intelligence or was otherwise incapable of understanding his rights. He acted calmly during the entire exchange.

The Court notes that Agent Destito did suggest that it was reasonable for Knight to conclude that his incarceration would mean that he would not be able to cooperate. Certainly if Destito had said that cooperation would result in his release, waiver of Miranda rights and any subsequent statements would be involuntary. However, in the instant case, Destito made no such promises. His speculation that Knight could reasonably believe that he would be released from custody if he cooperated was just that, mere speculation. Since the conduct of the interview was non-coercive and no promises were made in exchange for cooperation, Knight's waiver and statements were voluntarily made. His motion to suppress is therefore denied.

## VI. Conclusion

WHEREFORE the Court hereby denies all of the motions to suppress and dismiss raised by each defendant.